IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 3:12CR33 |
| v. | ) | (Judge John A. Gibney) |
| | ) | |
| PHILIP MICHAEL SEBOLT, | ) | |
| Defendant. | ) | |

### DEFENDANT'S OBJECTIONS TO PSR and MOTION FOR NON-GUIDELINE SENTENCE

COMES NOW, Philip Michael Sebolt, by counsel and states that he has reviewed the pre-sentence report ("PSR") and now lodges two objections. He first objects to the probation officer's application of a two-level increase for distribution of material pursuant U.S.S.G. §2G2.1(b)(3). The second objection raised is to the information included in the addendum regarding a certain December 6, 2012 letter *purportedly* written by the defendant and sent to a female inmate in Minnesota.[1]

Notwithstanding the Court's ruling on the objections outlined below, Mr. Sebolt respectfully requests the Court find that the 35 year mandatory minimum sentence applicable in his case represents a sentence sufficient to satisfy federal sentencing goals under 18 U.S.C. § 3553 (a). He request the Court order that the sentence run partially concurrent to the undischarged sentence he is presently serving.[2]

---

[1]The objection does not effect the guidelines directly but will potentially influence the court's analysis under 18 U.S.C. § 3553 (a) factors. Furthermore the undersigned does not anticipate the offering of evidence by the defense at the time of sentencing.

[2]Mr. Sebolt has roughly 15 years remaining on his prior federal sentence.

**OBJECTION TO GUIDELINE CALCULATION**

    I. <u>The Application of a Two-Level Enhancement for Distribution is in Error</u>.

 U.S.S.G. §2G2.1(b)(3) instructs that a two-level increase shall apply if the offense involved distribution.  Application note 1 defines distribution as "any act, including possession with the intent to distribute, production, transmission, advertisement, and transportation, related to the transfer of material involving the sexual exploitation of a minor.  The note continues, **"Accordingly, distribution includes posting material involving the sexual exploitation of a minor on a website for public viewing *but does not include* the mere solicitation of such material by a defendant."**

  The flyer which is the subject of the instant conviction, is a mere solicitation for material depicting or involving the sexual exploitation of a minor.  The application note is clear that a two-level increase is NOT appropriate in this instance.

  II.  <u>The December 6, 2012 Letter Should not be Considered nor Received by the Court</u>.

  The government has failed to offer any evidence to establish that the letter purportedly written by Mr. Sebolt is authentic.  As a result, Mr. Sebolt demands that the government establish the authenticity and reliability of the letter it seeks to introduce.

    Federal Rule of Evidence 901 (a) requires authentication or identification as a condition precedent to admissibility.  The proponent of the evidence must present evidence sufficient to support a finding that the matter in question is what its proponent claims.  FRE 901 (b) provides guidance as to the ways a proponent might seek to  authenticate evidence sought to be admitted.  Absent presentation by the government of evidence (at the time of sentencing) which would meet this burden, the defendant objects to the Court's consideration of said letter.

**POSITION ON SENTENCING**

*Discussion and Analysis*

"'[A] district court's job is not to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of [18 U.S.C.] section 3553(a)(2).'" *United States v. Conlan*, 500 F.3d 1167, 1169 (10th Cir. 2007) (quoting *United States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006)). The first sentence of 18 U.S.C. § 3553(a) recites this parsimony principle.

Section 3553(a)(2) addresses the need for the sentence imposed to (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment, (B) afford adequate deterrence to criminal conduct, (c) protect the public from further crimes by the defendant, and (D) provide him with needed education, training, and treatment. These factors overlap in part and are otherwise informed by additional factors the Court must consider in determining the particular sentence to impose, including (1) the nature and circumstances of the offense and history and characteristics of the defendant, (2) the kinds of sentences available, (4) the advisory Guideline range or pertinent policy statements, (5) the need to avoid unwanted disparities, and (6) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(1), (3) through (7).

The 35 year mandatory minimum sentence is sufficient to address each of the sentencing goals articulated, and life without the possibility of parole is greater than that which is necessary.

**Offense Background**

On September 13, 2012, Philip Sebolt was convicted in this court of Advertising Child Pornography in violation of Title 18 U.S.C. § 2251(d) following a bench trial. The government's evidence at trial was that between January 1, 2010 and February 19, 2010, Mr.

3

Sebolt, with or without the assistance of another, made and printed or caused to be made or printed a notice or advertisement, to wit: a flyer, offering to receive and/or buy visual depictions involving the use of a minor engaging in sexually explicit conduct. The flyers were then placed into envelopes which were addressed to various persons outside the United States.[3] Former inmate and government witness, Russell Bland, testified that Mr. Sebolt approached him shortly before his [Bland's] release date from the Federal Correctional Facility at Petersburg ("FCI Petersburg") and asked that he [Bland] mail several envelopes for him [Sebolt] to which Bland agreed. However, as Bland was being processed for release on February 19, 2010, prison officials discovered the mailings, along with a hardcover book bearing concealed compartments.

At the time of the instant offense, Mr. Sebolt was serving a 30 year federal sentence based upon conduct committed in 2002, and a cumulative 27 year sentence for two Illinois state convictions, with offense dates between December 1997 and December 1999. When Mr. Sebolt appears before this court on January 28, 2012, he will be subject to a mandatory minimum 35 years incarceration to life, the result of sentencing enhancements predicated upon his prior convictions relating to the sexual exploitation of children.

**Mr. Sebolt's Past**

Philip Sebolt is a 32-year old white male from Bensenville, Illinois. He was an only child, raised by his mother following her divorce from his father. Although Mr. Sebolt had no relationship with his father throughout his life, there was always the physical presence of both his uncle and grandfather. He reports, and his mother confirms, that growing up he was

---

[3]The return address on each envelope was "Phil, c/o Russell Cain, Rt. 4 Box 462, Salem, WV 26426, USA." Russell Cain is the birth name of inmate Russell Bland and the postal address belongs to Bland's family.

especially close to his uncle, who "spoiled" him. (PSR ¶35). He continues to maintain significant contact with his mother and uncle.

According to information contained in the PSR, Mr. Sebolt's childhood was uneventful, and he denies ever being the victim of any type of abuse, with emphasis on the absence of sexual abuse. Nonetheless, the PSR outlines a childhood filled with inappropriate childhood and adolescent sexual behavior, usually the tale-tale signs of early childhood sexual abuse.

Mr. Sebolt's deviant sexual behavior is thoroughly detailed in the presentence report and dates back as far as age 12. While the information regarding his prior misconduct is extremely disturbing, many of the accounts are uncorroborated tails by Sebolt himself, and one hopes they are nothing more than the creative fantasies of his own imagination. And while it is tempting - even difficult not to - consider this early childhood and adolescent misconduct when considering federal sentencing goals, it would be inappropriate to do so without also recognizing and understanding adolescent brain development.

Brain Development and Culpability of Children and Teens

Conventional scientific wisdom was that the adolescent brain achieved full development by the age of 14. *The International Justice Project: Brain Development, Culpability and the Death Penalty.*[4] However recent scientific advancements indicate that the adolescent brain undergoes rapid change and does not fully develop adult capacity until the early twenties. *Id*. Research is clear that this development and change occurs in all adolescents and the conclusions highlight the fact that the adult and teenage brains are physiologically different. One of the most

---

[4] Found at http://www.scribd.com/doc/2169002/Brain-Development-Culpability-and-the-Death-Penalty-by-the-International-Justice-Project

significant differences is found in the development of the frontal lobes or prefrontal cortex, an area which among other things control impulses, calms emotions, and provides an understanding of the consequences of behavior and allow reasoned, logical and rational decision making processes. *Id.*

An adolescent's ability to regulate emotions is also impaired in the undeveloped prefrontal cortex which can result in severe acts with little regard for consequences. Dr. Daniel Weinberger, Former Director of the Clinical Brain Disorders Laboratory at the National Institute of Health, made the point writing:

> I doubt that most school shooters intended to kill, in the adult sense of permanently ending a life and paying the consequences for the rest of their lives. Such intention would require a mature prefrontal cortex, which could anticipate the future and rationally appreciate cause and effect. The often reported lack of apparent remorse illustrates how unreal the reality is to these teenagers. Adolescents need people or institutions to prevent them from being in a potentially deadly situation where an immature brain is left to its own devices. If a gun is put in the control of the prefrontal cortex of a hurt and vengeful 15 year old, and it is pointed at a human target, it will very likely go off.[5]

Many of Mr. Sebolt's prior acts as recounted in the PSR occurred when he was a child, a teen, and then a young man - 21 or under. Undisputed research shows that at that time in his life his frontal lobe would not have been fully developed and therefore that he lacked the capacity of thinking as a fully functioning adult would. Like <u>all</u> adolescents in his *then* age group, the decision-making portion of his brain was not fully developed. Mr. Sebolt's behavior exemplified the poor impulse control and lack of appreciation for his actions characteristic of adolescents peers among his age range.

---

[5]*See* Daniel R. Weinberger, "A Brain Too Young For Good Judgment," *The New York Times*, March 10, 2001. p.A13

Of course not all adolescents run around engaging in sexually explicit and or illegal activity, but all do make at some time and to some extent, poor choices which are recognized as the consequence of their youthful ignorance and immaturity.[6] But the underlying reason remains the same. With an understanding and appreciation for adolescent brain development, one must recognize that it is unfair and unreasonable to view acts carried out during childhood and adolescent years through the same lense as you would analyze the same conduct if engaged in by an adult.

It is not inappropriate for the Court to consider Mr. Sebolt's limited brain development and lack of appreciation for his actions when considering his early criminal history and conduct. The Court should recognize Mr. Sebolt's cognitive deficits as a characteristic of the individual as contemplated by 18 U.S.C. 3553 (a)(1).

The Effects of Childhood Addiction to Pornography

Addictions by their very nature progress gradually, and manifest in subtle changes while causing harmful and long-term effects. Neurological studies of children who become addicted to Internet pornography show that the physiological changes in the brain of a porn addict almost exactly match those who are addicted to alcohol and drugs. Terrence Aym, *The Growing Epidemic of Children Addicted to Internet Porn*. (October 23, 2010).[7]

---

[6]Some steal their parents cars for the night, smoke and share (i.e. distribute) a little weed amongst/with friends, drink alcohol, break curfew, lie to their parents, or even make counterfeit money using their home printers; behaviors many of which are illegal.

[7]http://www.opednews.com/articles/2/The-growing-epidemic-of-ch-by-Terrence-Aym-101023-680.html

Early exposure to pornography negatively impacts the emotional development of an individual and the development of healthy sexual norms. Research findings by Dr. Victor Kline, a psychotherapist specializing in sexual addictions, and Retired Professor of Psychology at the University of Utah, Salt Lake City, suggest that "memories of experiences that occurred at times of emotional arousal [including sexual arousal] become imprinted on the brain and are difficult to erase." These children are at risk for developing sexual perversions that become permanently imprinted in their brains. **As a result of the addictive exposure, the actual physical structure of their brain changes**. *Id*.

Another study concluded that those under 14 years old habitually exposed to pornographic material have an increased likelihood of becoming sexual predators.[8] Males within this group are more sexually active and engage in more varied sexual behaviors as adults than is true for males not exposed to such material. *Id.* Yet another study supports the finding that pornographic exposure can cause children to make sexual advances towards other children.[9]

Mr. Sebolt's Deviant Sexual Behavior is the Result of a Recognized Illness

Paraphilia is a psychosexual disorder in which sexual gratification is obtained through highly unusual practices that are harmful or humiliating to others or socially repugnant, such as pedophilia. Pedophilia is the sexual attraction to prepubescent children, by individuals at least 16 years old and at least 5 years older than the child. *Diagnostic and Statistical Manual of Mental Disorders* (DSM), 4th Edition.

---

[8] W.L. Marshall, "The Use of Sexually Explicit Stimuli by Rapists, Child Molesters, and Nonoffenders," The Journal of Sex Research 25, no.2 (May 1988): 267-88.

[9] Stephen J. Kavanagh, Protecting Children in Cyberspace (Springfield, VA: Behavioral Psychotherapy Center, 1997), 58-59.

<u>Treatment Options Exist Yet Mr. Sebolt has been Denied Access to ANY type of Treatment</u>

There are recognized treatment options for pedophilic individuals. Treatment typically involves intensive psychotherapy to work on deep rooted issues concerning sexuality, feelings of self, and often childhood abuse. *DSM-IV*.

The sentencing judge presiding over Mr. Sebolt's prior federal conviction expressed both the need for Mr. Sebolt to receive intensive and immediate treatment, and the opinion that without such rehabilitative resources, Mr. Sebolt was highly likely to re-offend.

Mr. Sebolt himself has requested help on several occasions including at the time of his original sentencing in 2004. His request was not the showy request of a defendant at sentencing, desperate to present himself in a more favorable light thereby obtaining a more lenient sentence. No, Mr. Sebolt's plea for help was sincere and ongoing. Once he was received at BOP, he made numerous requests for treatment. (See attachments). He requested transfer to a facility with a sex offender treatment program and was eventually transferred to FCI Petersburg for that very reason. However once at FCI Petersburg he was informed that he would not be allowed to participate in the program as program entry was reserved for individuals with 24 months or less remaining on their sentence.

<u>A prison term longer than 35 years is not necessary to provide needed training or care, or even correctional treatment in the most effective manner</u>**.**

First and foremost a longer sentence will only ensure that Mr. Sebolt's illness will continue to go untreated. A longer sentence would only serve to prolong Mr. Sebolt's release date (which is the triggering date for purposes of treatment and rehabilitation efforts by the BOP). Second, other vocational training is not a true consideration since Mr. Sebolt will be

roughly 80 years old *IF he survives* a 35 year consecutive sentence[10] and too old to get a job. (At the very least he would not be considered a viable prospect by employers).

Yet it is a fact that treatment lowers the risk of recidivism among offenders. It is also abundantly clear that Mr. Sebolt desperately needs treatment. Thus far his request for treatment has been ignored. Unless the Bureau of Prisons changes it's policies Mr. Sebolt's rehabilitative needs will not be accommodated adequately in a federal institution. Imposition of a sentence longer than the 35 year mandatory minimum is in direct conflict with the sentencing goals set forth in 18 U.S.C. § 3553 (a)(2)(D).

Other Tools Available to Protect the Community

**BOP Restrictions**

Mr. Sebolt will undoubtedly be subject to more severe restrictions during his remaining incarceration within the Bureau of Prisons. The instant criminal law violation and conviction will result in an increase in his security risk assessment score resulting in a possible transfer to a United States Penitentiary ("U.S.P.").

Mr. Sebolt has already lost phone, mail, and visitation privileges at the prison as a result of his misconduct. It is not likely that these privileges will be restored within the foreseeable future, especially should the behavior resume or continue in the future.[11]

---

[10] He would be at least 65 years old if the court were to impose a partially concurrent sentence as requested herein.

[11] In addition to lost privileges, the Court should also take into account other punishment already imposed by the BOP including 11 months in an isolated special housing unit ("the SHU").

**Lifetime supervision**

Should Mr. Sebolt live beyond the 50 years incarceration that lyes ahead, he will be subject to a mandatory lifetime on supervised release. Conditions which have been imposed upon persons similarly situated have included an order that the convicted not be permitted to have "direct or indirect" unsupervised contact with anyone under the age of eighteen, a ban on being within 100 feet of places where minors congregate unless approved by his probation officer, a restriction on interstate travel without prior approval, and a prohibition on viewing any pornography whatsoever. In order to further minimize the risk of recidivism and danger to the community, the Court could impose a requirement that Mr. Sebolt participate in a mental health evaluation and counseling, including psychotherapy upon his release, and order that he take any prescription drugs as directed. Other available safeguards include imposing a condition that Mr. Sebolt not be permitted to use any computer except for work, or, without approval, any other electronic media—such as a cellular phone—with Internet capability. Finally, Mr. Sebolt will be required to register as a sex offender pursuant to SORNA. This constant monitoring tool will help ensure that Mr. Sebolt's whereabouts are known by law enforcement and by those in the community, especially parents who seek to protect their children.

**Civil Commitment**

With the passage of the Adam Walsh Act, the government also enacted legislation to allow for civil commitments of sexually dangerous persons. *See* 18 U.S.C. § 4248. The statute allows for indefinite civil commitment of persons who are found to be sexually dangerous persons or sexual predators who have serious difficulty controlling their sexual behavior. This

civil commitment immediately follows satisfaction of a criminal sentence and if successful, prevents sexually dangerous predators from being released back into the community.

The process is initiated with the filing of a notice by the BOP certifying that an individual in their custody is a "sexually dangerous person." 18 U.S.C. § 4248 (a). The filing of the notice stays the release pending completion of the commitment procedures. A court then holds a hearing to determine if the person meets the criteria for commitment. If the court finds by "clear and convincing" evidence that the person is a "sexually dangerous person" the individual is committed. 18 U.S.C. § 4248 (d).

Civil Commitment is another government tool available in the future should Mr. Sebolt present a danger to the community 50 years from now.

A Life Sentence is not Warranted

As abhorrent as the facts surrounding Mr. Sebolt's conviction may be, his conduct does not warrant life imprisonment without the possibility of parole. It does not promote respect for the law (or reinforce other sentencing purposes) for this defendant to receive a sentence far exceeding that of most convicted rapists, or exceeding even that commonly imposed on convicted murderers.

Conduct more aggravating than that for which Mr. Sebolt is being sentenced has resulted in sentences shorter than the 420 month mandatory minimum applicable in this case.

A defrocked priest was sentenced in February 2005 in Boston to 12-15 years in prison for repeatedly raping and fondling a boy in his parish, beginning when the boy was 6 years old.[12] In

---

[12] Http://www.boston.com/news/local/massachusetts/articles/2005/02/25/defrocked_priest_paul_shanley_sentenced_to_12_to_15_years_for_child_rape/.

2011, a priest from Saratoga Springs, NY was sentenced to 20-25 years after being convicted of two counts forcible rape of a child.[13] A 31-year-old Missouri woman was sentenced to only 10 years for facilitating the sexual assault of 2 young girls under the age of 5, including her own daughter, by two men; one of whom was sentenced to 15 years for the actual sexual assault of the toddlers.[14] And most notably in recent news former Penn State Football Coach, Jerry Sandusky, was sentenced to serve 30 to 60 years in prison following his conviction for sexually abusing at least ten (10) boys over a 15 year period.[15]

According to the latest Bureau of Justice Statistics (BJS) Survey of large urban sentencing practices, even convicted murderers received a mean prison sentence of 308 months, and rapists 152 months. BJS, *Special Report: Violent Felons in Large Urban Counties* 8, Table 16 (July 2006, NCJ 205289).[16] The median (50th percentile) prison sentences for murder and rape were 240 months and 120 months, respectively. *Id.*; *see also* BJS, *State Court Sentencing of Convicted Felons, 2002*, Statistical Tables, Table 1.5 (May 2005, NCJ 208910) (mean sentences in much larger sample of state cases of 225 months for murder and 132 months for rape).[17]

---

[13] http://www.saratogian.com/articles/2011/02/16/news/doc4d5c3be315a49064570164.txt

[14] Http://www.kmov.com/news/editors-pick/woman-sentenced-to-10-years-for-role-in-child-sexual-abuse-case-179575491.html.

[15] http://abcnews.go.com/US/jerry-sandusky-sentenced-30-60-years-prison/story?id=17427234

[16] This publication is available on-line at http://www.ojp.usdoj.gov/bjs/pub/pdf/vfluc.pdf

[17] See abstract at http://www.ojp.usdoj.gov/bjs/pub/pdf/sc0201st.pdf

Federal statistics are not dramatically different. In fiscal 2011, for example, federal (non-capital) murder yielded mean and median sentencing figures of 238 months and 210 months, respectively. The figures were 276 and 251 months, respectively, for fiscal 2010. USSC, *2011 Sourcebook of Federal Sentencing Statistics* [hereinafter "*2011 Sourcebook*"] Table 13.[18]

A 420-month-sentence is not lenient. It is almost twice as great as the average sentence imposed for rape or murder in both 2010 and 2011. It is more than sufficient to reflect the seriousness of the offense and promote respect for the law. Absent sex offender treatment to address his very serious mental health illness, no sentence alone is likely to truly protect the community (i.e. lower the risk of recidivism). The solution here is not to impose a longer sentence. The solution is to make serious efforts to address the root cause of the behavior through immediate treatment and counseling.

## Conclusion

Criminal punishment serves four primary purposes: rehabilitation, retribution, deterrence, and incapacitation. *See* 18 U.S.C. § 3553 (a). The effectiveness of punishment - whether life in prison or a week in jail – should be measured against these four goals while recognizing that no punishment should be more severe than necessary. Sentencing an individual to life without the possibility of parole fails to meet that directive.

---

[18]available at http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_Sourcebooks/2011/SBTOC11.htm); *2010 Sourcebook* Table 13 (available at http://www.ussc.gov/Data_and_Statistics/Annual_Reports_and_Sourcebooks/2010/SBTOC10.htm).

Recognizing that all human rights derive from the inherent dignity of the human being, the essential aim of all penal systems must be to allow, encourage, and facilitate rehabilitation.[19] However, life without the possibility of parole negates this by sending a clear message that Mr. Sebolt is forever expelled from society, no matter how much he may eventually change or grow. **The goal of rehabilitation "cannot be served if a defendant can look forward to nothing beyond imprisonment.  Hope is the necessary condition of mankind..."** United States v. Carvajal, 2005 WL 476125 (S.D.N.Y. Feb. 22, 2005)

WHEREFORE, Mr. Sebolt respectfully requests that the Court impose a sentence no greater than 420 months, with 180 months to run concurrent with 30 year federal sentence he is presently serving. He also asks the Court to strongly recommend to the Bureau of Prisons that he be placed in a sex offender treatment program immediately.  Finally, Mr. Sebolt request the Court recommend a BOP placement at an appropriate facility as close to Bensonville, Illinois as possible.

        Respectfully submitted,
        PHILIP M. SEBOLT

By:___/s/_____
        Counsel

Valencia Roberts, Esq.
Va. Bar # 44999
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, VA   23219-1884
(804) 565-0885
(804) 648-5033 (fax)
valencia_roberts@fd.org

---

[19]

## CERTIFICATE OF SERVICE

I hereby certify that on the 19TH day of January 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to Elizabeth Wu, Assistant U.S. Attorney, 600 E. Main Street, Suite 1800, Richmond, VA 23219, elizabeth.Wu@usdoj.gov  and Thomas K. Johnstone IV, Special Assistant U.S. Attorney, Virginia Office of the Attorney General, tjohnstone@oag.state.va.us.  A copy was also provided to Probation Officer Jonathan Andrews, 701 E. Broad Street, Suite 1150, Richmond, VA 23219.

_____/s/_____
Counsel

Valencia Roberts, Esq.
Va. Bar # 44999
Office of the Federal Public Defender
701 E. Broad Street, Suite 3600
Richmond, VA   23219-1884
(804) 565-0885
(804) 648-5033 (fax)
valencia_roberts@fd.org