IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


The United States of America,

                              Plaintiff,

                 versus        3:12-CR-33

Philip Michael Sebolt,

                              Defendant


Before:  HONORABLE JOHN A. GIBNEY, JR.
         United States District Judge


Sentencing


January 28, 2012
Richmond, Virginia


Gilbert F. Halasz, RMR
Official Court Reporter
U. S. Courthouse
701 East Broad Street
Richmond, Virginia 23219
(804) 916-2248

APPEARANCES

Elizabeth C. Wu, Esq.
Assistant United States Attorney

Thomas K. Johnstone, IV, Esq.
Assistant Attorney General
For the United States


Valencia D. Roberts, Esq.
Assistant Public Defender
For the defendant
The defendant
in his own proper person

1          THE CLERK:  Case 3:12 CR 33.

2          The United States of America versus Philip Michael Sebolt.

3          Mr. Thomas K. Johnstone, IV and Elizabeth C. Wu represent the

4     United States.

5          Ms Valencia Roberts represents the defendant.

6          Are counsel ready to proceed?

7          MR. JOHNSTONE:  United States is ready.

8          MS ROBERTS:  Defense is ready.

9          THE COURT:  All right.

10         We are here today for the sentencing of Mr. Sebolt.  The

11    government has no objections to the presentence report --

12         MR. JOHNSTONE:  That's correct.

13         THE COURT:  -- or the guidelines calculation; is

14    that right?

15         MR. JOHNSTONE:  That's correct.

16         THE COURT:  Mrs. Roberts, I understand you that

17    you do have some objections to the presentence report

18    and calculations.

19         MS ROBERTS:  Yes, Your Honor.

20         THE COURT:  Go ahead.  Come up to the podium.

21         MS ROBERTS:  Your Honor, the first objection

22    that we lodged is to the two-level increase for

23    distribution of material pursuant to US Sentencing

24    Guidelines section 2 G 2.1 B 3.  I think, as outlined

25    the objections in the written position -- and I don't

1    have any additional evidence to add or any additional

2    argument outside of what was previously submitted --

3        THE COURT:  Thank you.

4        I am going to overrule that objection because -- two reasons.

5    One is, that he sent out his flyer, or whatever you would call this.

6    It had some pornographic pictures on either the back or front side of

7    it, depending on which way you define back and front.  And then the

8    offense involved distribution.  And, of course, it did, because one of

9    the mothers in the third world sent him back a photograph of her

10   child.  So -- one of the parents -- I don't know whether it was the

11   mother or the father.

12       So that one is overruled.

13       MS ROBERTS:  If The Court would hear a response.

14       THE COURT:  Yes, sure.

15       Your Honor, The Court indicated that the material Mr. Sebolt sent

16   out was of a photographic nature.  However, if The Court will recall

17   from the evidence at trial, each of those photographs were photographs

18   from news magazines, National Geographic, other such magazines.

19       THE COURT:  Weren't there drawings on it, too?

20       MS ROBERTS:  Your Honor, it did include some

21   animated drawings.

22       THE COURT:  What were they doing in the animated

23   drawings?

24       MS ROBERTS:  Your Honor, the animated drawings

25   displayed genitals.  However, I think that in order

1   for it to qualify as child pornography the law

2   requires more than drawing, a depiction --

3        THE COURT:  Do we have a copy of that thing?

4        MR. JOHNSTONE:  Your Honor, I have exhibit

5   three.

6        THE COURT:  Mr. Creekmore, could you go get that

7   from the government's attorney?  All right.

8        Anything else?  I have looked at it.

9        MS ROBERTS:  Your Honor, in addition to that,

10  what I had begun to do at the very beginning of this

11  case after viewing the photographs exhibited on the

12  back of the flyer was to collect the periodicals and

13  try to identify what periodicals the various photos

14  were taken from in anticipation of an argument that

15  the images constituted child pornography.  However,

16  in my discussions with the government I believed

17  early on that they were conceding that the images

18  themselves were taken from magazine, reputable

19  magazines, and therefore were not child pornography.

20  But one of the images depicted came from this

21  magazine, Interview Magazine, which is not a

22  pornographic magazine.  And I would like to offer

23  this to The Court.

24        THE COURT:  Sure.

25        MS ROBERTS:  I would refer The Court to page 102

1   of the magazine.  The photo at the bottom right --

2        THE COURT:  Okay.  Let me take a look at it.

3        MS ROBERTS:  -- of the page.

4        If The Court would, in thumbing through the magazine see that the

5   magazine is not a magazine which contains --

6        THE COURT:  Is not a what?

7        MS ROBERTS:  -- not a magazine which contains

8   pornography.

9        THE COURT:  Right.

10       MS ROBERTS:  And as a matter of fact, the back

11  cover is a feature photo of a former president.  This

12  is a reputable magazine.  Mr. Sebolt would have had

13  access to the photos that were used to make the

14  collage through various magazines, such as this one

15  here, Interview Magazine.  So it is my position and

16  my argument that an item which has artistic value

17  does not become pornography because the person who

18  views it is aroused by it.  That is if --

19       THE COURT:  It is an objective test, is what you

20  are saying, that we need to look at in the whole

21  context in which it is printed.

22       MS ROBERTS:  Yes, Your Honor.  Certainly it is

23  not pornographic as Your Honor looks at the magazine.

24  And it would not be pornographic just because

25  Mr. Sebolt may look at that same photo and become

1    aroused.  That is an example of the types of pictures

2    that were used in the collage.

3         THE COURT:  What about this one of the girl in

4    the lower right hand corner?

5         MS ROBERTS:  Your Honor, I have only blacked out

6    copies of --

7         THE COURT:  Of this?

8         MS ROBERTS:  Right.

9         THE COURT:  Thank you.  I will receive the

10   Interview Magazine.

11        MS ROBERTS:  Looking back at the photo The Court

12   has there.  I don't have a copy.

13        THE COURT:  I am sorry.  It is a little girl

14   with, looks like her -- here, you can look at this.

15        MS ROBERTS:  I am not sure which photo

16   specifically.

17        THE COURT:  The little girl sitting there in the

18   lower right hand corner just below that young man

19   that you just showed me on page 102 of the magazine.

20        MS ROBERTS:  Yes, Your Honor.

21        THE COURT:  Young man with his daughter, I

22   guess.

23        MS ROBERTS:  Yes, Your Honor.  Again, Your

24   Honor, none of these were actual photos that were

25   taken and sent to Mr. Sebolt.  All of these came from

1    magazines, newspaper clippings, and the like.

2        THE COURT:  Well, did he get a picture back when

3    he sent out his recruitment brochure?

4        MS ROBERTS:  As a result of this flyer, no, Your

5    Honor, because it was intercepted.

6        THE COURT:  Right.

7        MS ROBERTS:  I think that the government's

8    evidence would be that he had previously mailed a

9    letter in which he requested certain photos, and I

10    believe it was --

11        THE COURT:  The brochure was in the thing that

12    the guy had with him as he was leaving the prison.

13    The other gentleman.

14        MS ROBERTS:  Yes, Your Honor.

15        THE COURT:  Okay.

16        MS ROBERTS:  So even if The Court were to

17    consider the distribution, the second basis for the

18    Court overruling the objection was that Mr. Tedeski

19    sent a photo to Mr. Sebolt.  And that would be

20    Mr. Tedeski, perhaps, distributing.  But it would not

21    be Mr. Sebolt distributing.  I think that --

22        THE COURT:  Well, the offense has to involve the

23    distribution.

24        MS ROBERTS:  Yes, Your Honor.

25        But specifically the application note one defines distribution as

1    any act, including possession with the intent to distribute,

2    production, transmission, advertisement or transportation related to

3    the transfer of material involving the sexual exploitation.  It's very

4    specific.  It would look to the material that Mr. Sebolt sent or

5    attempted to send.  The note continues, accordingly, distribution

6    includes posting material involving the sexual exploitation of a minor

7    on a web site for public viewing, but does not include the mere

8    solicitation of such material by a defendant.

9         What we have here is advertisement soliciting individuals to send

10    in material which involves sexual exploitation of a minor.

11    Application note one seems to be directly on point.

12         THE COURT:  Well, distribution means any act.

13    It says, including possession with intent to

14    distribute, including production.  Any act related to

15    the transfer of material involving the sexual

16    exploitation of a minor.  Any act -- Didn't he get a

17    picture back that exploited, sexually exploited a

18    minor?  Not from this thing, but something else?

19         MS ROBERTS:  I think a good example, perhaps the

20    best example I can make, if we were not talking about

21    this material, but if we were talking about drugs, if

22    someone had solicited another person for drugs and

23    that person in exchange distributed or sent drugs to

24    the individual that made the request, you wouldn't

25    say the individual who made the request either

1    distributed, produced, transmitted, or advertised --

2    I guess advertised in that sense -- but the

3    application note makes it, clarifies it.  You

4    wouldn't say that person possessed with the intent to

5    distribute the drugs that he requested and therefore

6    thereby received.  You would say that that person

7    solicited for drugs.  So while the exchange, the

8    total exchange, if it had been successful, if it had

9    gone out to its conclusion -- I don't even think --

10   it would have been a different scenario -- then I

11   think when you are talking about the distribution

12   portion of it, it is looking only to the material

13   that Mr. Sebolt sent out.  That would be the

14   distribution or the possession with the intent to

15   distribute.  That is the material --

16        THE COURT:  Why aren't the materials that he

17   sent out an advertisement for, related to the

18   transfer of material involving the sexual

19   exploitation of a minor?  Suppose I took out an

20   advertisement in the classified ads in the Times

21   Dispatch that said, send me pictures of your children

22   in sexual poses.  Wouldn't I be violating the sexual

23   distribution requirement as it is defined here?

24   Because it would be an act, including advertisement,

25   related to the transfer of material.

1          MS ROBERTS:  No, Your Honor.  I think what you

2     would have done would have been a solicitation.  And

3     advertisement would be more akin to displaying photos

4     to be received by others, advertising a product to be

5     received or distributed.

6          THE COURT:  I would have to say "for sale,

7     pictures of children doing bad things?"  Then I would

8     be guilty of that.  Whether there was a picture or

9     not, right?  Well, that's alright.

10          MS ROBERTS:  I don't know if there were no

11     pictures.  But I do think that when we talk about

12     advertisement, that is an offer by the person who is

13     presenting it.  For the person who views it to then

14     request or obtain the item that I have, that the

15     advertiser has to distribute.  Again, he doesn't have

16     items to distribute.  These photos taken from

17     magazines were meant to be demonstrative.  And he

18     used what resources he had available to him.  But,

19     again, these images are not child pornography.  And

20     what he did, the solicitation, solicitation is

21     different from advertising.  Again, advertising being

22     an offer for you to purchase or obtain goods that I

23     have available.  And a solicitation being an offer

24     from me to receive what you have.  So I can't be the

25     distributor.  I would be the recipient of that.

1        THE COURT:  Okay.  Tell me what your second

2    objection is, if you care to address that now.

3        MS ROBERTS:  Your Honor, Mr. Sebolt, by way of

4    our second objection, objects to the reliability

5    of --

6        THE COURT:  Of the --

7        MS ROBERTS:  -- of the letter.  It does not

8    affect the guidelines, but certainly it would reflect

9    upon this Court's weighing of an appropriate sentence

10   under 3553(a).  I don't have anything to add --

11       THE COURT:  Okay.

12       MS ROBERTS:  -- to that argument.  I think that

13   the government plans to offer some evidence.  So if

14   it is appropriate, I guess we will renew the

15   objection.

16       THE COURT:  Thank you very much.

17       All right.  Let me hear from the government.  Who is handling

18   this today?  One of the thirds?

19       MR. JOHNSTONE:  Thank you, Your Honor.  The

20   government has one witness for the defendant's

21   second --

22       THE COURT:  Are you Mr. Johnstone?

23       MR. JOHNSTONE:  Yes, sir.

24       THE COURT:  Give this back to him, please.

25       MR. JOHNSTONE:  Would you like me to address the

1    first objection?

2         THE COURT:  First one first.

3         MR. JOHNSTONE:  With respect to the first

4    objection, the government concedes that the

5    sketches --

6         THE COURT:  They are not pornography.

7         MR. JOHNSTONE:  -- on the back of the flyer

8    don't count in terms of being child pornography.  But

9    in looking at the back of this advertisement it does

10   appear that at least one or two of the images have

11   been cropped to make the child's genitals the focus

12   of the picture.  Specifically, there is one about a

13   third of the way down on the left which clearly shows

14   a male child's genitals as the focus of the picture.

15   The government contends that The Court can rely on

16   that as distribution of pornographic material

17   involving a child to apply the plus two

18   enhancement --

19        THE COURT:  Okay.

20        MR. JOHNSTONE:  -- to the guidelines.

21        With respect to the second objection, the government would call

22   Jose Negron to the stand.

23        THE COURT:  All right.

24                      JOSE NEGRON

25             WAS SWORN AND TESTIFIED AS FOLLOWS:

 1                    DIRECT EXAMINATION

 2          THE COURT:  Good to see you again.  Were you a

 3   witness in this case?

 4          THE WITNESS:  No, I wasn't a witness.

 5          THE COURT:  With the guy that was smuggling in

 6   the heroin?

 7          THE WITNESS:  Yes.

 8          THE COURT:  Okay.  Thank you.  Good to see you

 9   again.

10          THE WITNESS:  Thank you, Your Honor.

11   BY MR. JOHNSTONE:

12   Q    Please state your name for the record.

13   A    Jose Negron.

14   Q    Where do you work?

15   A    I work at the Federal Correctional Complex,

16   Petersburg, Virginia.

17   Q    In what capacity are you employed at F. C. I.

18   Petersburg?

19   A    I am a special investigative agent for that

20   complex.

21   Q    Were you involved in the investigation of the

22   defendant?

23   A    Yes, I was.

24   Q    Were you also the recent recipient of an e-mail

25   from a prison official at F. C. I. Waseca in

1    Minnesota?

2    A    Yes.

3    Q    When did you receive that?

4    A    I received that on January 2nd of this year,

5    2013.

6    Q    What was that e-mail regarding?

7    A    The e-mail regards a matter, a letter that was

8    received from Waseca.

9    Q    I will hand you what has been marked

10   Government's exhibit 1.  Do you recognize this

11   document?

12   A    Yes, I do.

13   Q    Can you describe it for The Court?

14   A    Basically an e-mail I received from the

15   lieutenant by the name of Tony Duncan, who is an

16   investigator at F. C. I. Waseca, Minnesota.

17   Q    What documents, if any, were attached to the

18   e-mail?

19   A    The other attachment was another e-mail from a

20   detective named Justice Paddy, who was detective out

21   of Illinois; along with a letter containing a

22   six-page handwritten note or handwritten letter.

23   Q    Was there also an envelope among the

24   attachments?

25   A    Yes, there was as well.

1    Q     To whom was that addressed?

2    A     To a Tracy Wright.

3    Q     Have you been table to determine who Tracy

4    Wright is?

5    A     Yes.

6    Q     How were you able to determine that?

7    A     Tracy Wright -- on the letter there is a federal

8    register number listed on the letter.  We were able

9    to pull up her information.  Is actually a female

10   federal inmate that is incarcerated at F. C. I.

11   Waseca.

12   Q     Do you know what her offense is?

13   A     Sex offender.

14   Q     What address appears in the return address space

15   on the envelope?

16   A     On the return address it had 1100 Taft Avenue,

17   Berkley, Illinois.

18   Q     Are you familiar with that address?

19   A     Yes, I am.

20   Q     How?

21   A     I am familiar with that address which is listed

22   on Sebolt's visit list, and on his e-mail, which he

23   generates as far as address labels.

24   Q     So as an inmate in Petersburg does the defendant

25   have to generate a list of individuals to whom he

1    will be mailing correspondence?

2    A    Yes.

3    Q    As part of that process does he provide the

4    addresses for those individuals?

5    A    He provides that information on the computer

6    which he puts it down and maintains as a contact

7    list.

8    Q    Now, is this 1100 Taft Avenue among those

9    addresses the defendant has put into that system?

10   A    Yes.

11   Q    Turn your attention to the letter, if you could.

12   Have you read the letter?

13   A    Yes.  Yes, I have.

14   Q    What does it regard?

15   A    Many things.  Basically on the letter he goes,

16   mentions how he likes to meet a female the same age

17   of him.  Also mentions how he wants to share what he

18   is into with this female.  Goes on talking about his

19   sexual preference on the letter.  Mostly young

20   toddlers and child -- mostly boys.  And he goes on

21   talking about how he reviews child pornography and

22   videos.  And he also talks about molesting one of his

23   relatives.

24   Q    What name appears at the end of the letter?

25   A    At the end of the letter his name appears, which

Negron – direct

1    is Phil.

2    Q    Now, when the defendant was housed at F. C. I.

3    Petersburg, were you responsible for monitoring his

4    mail?

5    A    Yes.

6    Q    Have you reviewed letters that he has written?

7    A    Yes.

8    Q    Do you recognize that handwriting at the bottom

9    of that letter?

10   A    Yes, I do.

11   Q    Whose handwriting do you recognize it to be?

12   A    The handwriting that I recognize is Phil, Phil

13   Sebolt.

14   Q    Are you basing that statement on numerous

15   letters that you have reviewed in the past that he

16   has written?

17   A    Yes.  Mail that comes to our department, which

18   we had to review mail coming in, going out, and mail

19   that we have seen in the cell.

20   Q    Finally, if you could just let The Court know

21   what the defendant references in the ps section, in

22   the post script section of that letter.

23   A    The ps, he references that he received -- he

24   received a letter from Tracy Wright via his uncle.

25   Q    Have you spoken to any personnel at F. C. I.

1   Waseca about that e-mail?

2   A    Yes.

3   Q    Did they conduct any investigation into its

4   origins?

5   A    Yes.

6   Q    First, who did you speak to at F. C. I.?

7   A    Tony Duncan, the lieutenant.

8   Q    What did he say about their investigation of the

9   letter?

10   A    His investigation, he determined that the return

11   address belonged to a relative of Sebolt.

12   Q    The Illinois address?

13   A    Yes.

14   Q    No further questions, Your Honor.

15        THE COURT:  All right.

16        Cross examination?

17                    CROSS EXAMINATION

18   BY MS ROBERTS:

19   Q    Good afternoon.  Or good morning, Agent Negron.

20   A    Good morning.

21   Q    This letter that you make reference to was

22   written December 6 of 2012; correct?  Or it was dated

23   December 6?

24   A    It was, date on this letter on page one is

25   December 6 of 2012.

1    Q    December 6 of 2012.  Mr. Sebolt was not at F. C.

2    I. Petersburg?

3    A    That's correct.

4         THE COURT:  Was not where?

5         MS ROBERTS:  F. C. I. Petersburg.

6         THE COURT:  Right.

7    BY MS ROBERTS:

8    Q    And had not been since March of 2012.

9    A    Correct.

10   Q    You had no contact with Mr. Sebolt or the

11   monitoring of his mail in at least that amount of

12   time, correct?

13   A    During that time, yes, because he was housed at

14   a different facility.

15        In other words, he was not housed at Petersburg.

16   Q    Right.  You indicated that you personally

17   monitored his mail as part of your job duties at F.

18   C. I. Petersburg?

19   A    Yes.

20   Q    As the special investigator are you in charge of

21   other individuals on the entire unit?

22   A    In charge basically of the investigative

23   department for that facility, which I have a couple

24   of techs or investigative lieutenants working under

25   me.

Negron – cross                                        21

1   Q     Okay.  And this particular letter here, you were

2   asked to see, to take a look at this letter in

3   preparation for today's sentencing hearing; is that

4   correct?

5   A     Yes.

6   Q     And when you give the opinion that you recognize

7   this handwriting as Mr. Sebolt's, that opinion was --

8   you were asked for your opinion in preparation of

9   today's hearing; correct?

10  A     I was to take a look at the letter, yes.

11  Q     Now, Mr. Sebolt was housed at Northern Neck

12  Regional Jail in Warsaw; is that correct?  Currently

13  housed there, correct?

14  A     Yes.

15  Q     He was housed there in December of 2012 as well;

16  correct?

17  A     Yes.

18  Q     And the return address on the envelope is not a

19  Virginia address; correct?

20  A     Was not -- it is not a Virginia address; that is

21  correct.

22  Q     And the post mark is not a Virginia postmark?

23  A     It doesn't appear to be, no.

24  Q     And when you say that you recognized the

25  handwriting to be consistent with handwriting that

1    you looked at belonging to Mr. Sebolt in the past,

2    are you referring to the envelope as well?

3    A    Yes, I am referring to the envelope and the

4    letter as well.

5    Q    So it is your opinion that the envelope and the

6    writing on the envelope is also consistent with

7    Mr. Sebolt's handwriting?

8    A    The sender looks identical from what I have seen

9    before on his handwriting samplers with the letter.

10   Q    One moment.

11        Officer Negron, when you compare the writing

12   on -- let's first start with the envelope.  That

13   handwriting is in cursive; correct?

14   A    Yes.

15   Q    And you have previously viewed the other

16   envelopes and letters that were offered by the

17   government in its case in chief at trial; correct?

18   A    Not at trial, no.  I looked at his letter while

19   he was at Petersburg.

20   Q    Is there any particular -- and I don't mean you

21   have to get very specific -- but what year?  But is

22   there any particular letter that you have previously

23   viewed that you have in mind when you compare this

24   handwriting to prior writings before, purportedly by

25   Mr. Sebolt?

1    A    The letter that I reviewed, again before this

2    came about and while he was still at Petersburg, the

3    letter that we intercepted, I have to go back at

4    least a year or two, is when I seen his handwriting

5    sampler with this letter here.

6    Q    One moment.

7         MS ROBERTS:  No further questions.

8         THE COURT:  Thank you.  I will receive the

9    letter.

10        Let me take a look at it.

11        Okay.  That will be received.  All right.  Anything else on the

12   guidelines in this case?

13        MR. JOHNSTONE:  No further evidence, Your Honor

14   Mr. Negron could be excused.

15        THE COURT:  I am sorry.  I forgot you were

16   sitting there.

17                   (Witness stood aside)

18        If I ever do that again wave your hand or something.  Okay.  All

19   right.

20        MS ROBERTS:  No evidence, Your Honor.

21        THE COURT:  Okay.

22        I have received the letters into evidence over the objection of

23   the defendant.

24        The guidelines calculation works out as follows:

25        Because Mr. Sebolt has engaged in an action seeking by notice or

1    advertisement a minor to engage in sexually explicit conduct, he goes

2    to section -- the guidelines for him are calculated in section 2 G 2.1

3    if they are greater than the ones under 2 G 2.2.  Under 2 G 2.2 as

4    reflected on page 28 of 36 in the presentence report his guidelines

5    are calculated as follows.  Base offense level of 22 for advertising

6    for child pornography.  Two points off because he did not intend to

7    traffic in or distribute such material.  Plus two points because the

8    material involved a pre-pubescent minor.  Plus two points more because

9    it involved distribution not otherwise specified, i.e., an attempt to

10   get pornography from other people.  And plus five because he engaged

11   in a pattern of activity involving the sexual abuse or exploitation of

12   a minor results in an offense level of 29.  Since that is lower than

13   the level under 2 G 2.1 is we go to 2 G 2.1 1 A, which has a base

14   offense level of 32.  He gets four points because the offense involved

15   a minor who had not attained age of 12.  And he gets the two points,

16   as I said earlier, for distribution.  That leads to a guidelines level

17   of 38.

18        There are no adjustments to the offense level.  And his adjusted

19   offense level is 38.  He will not get any points off for acceptance of

20   responsibility.  So his total offense level is 38.

21        The criminal history in this case is nine points.  He gets six

22   points for prior convictions.  Plus two because he was incarcerated at

23   the time of the offense.  Plus one because he had a prior offense that

24   did not result in additional criminal history points.

25        That makes him a category five.  And this is a restricted

1    guideline case -- I think if it is category five the low end of the

2    guidelines would be 360.  High end is life.  But there is a case in

3    which the mandatory minimum is 420.  So essentially the sentencing

4    guidelines range is a restricted one of 420 to life.  And the

5    guidelines, of course, are advisory only.  All right.

6          I have gotten two letters in the case that I will advise counsel

7    about.  I don't know whether you have seen these or not.

8          Have you seen these, counsel?

9          MR. JOHNSTONE:  No, Your Honor.

10         THE COURT:  All right.

11         Well, they were attached -- I got them with the defendant's

12   position on sentencing.

13         THE CLERK:  They were sent directly to you.

14         THE COURT:  I'm sorry.  Sent directly to me.

15         Have you seen them, ma'am?

16         MS ROBERTS:  I believe so.  The Court forwarded

17   the letters to us.

18         THE COURT:  I will tell you, Mr. Johnstone,

19   these are letters -- one is from, purports to be from

20   Mrs. Sebolt, his mother; his uncle, Roger Devorak;

21   and his grandfather, Vladamir Devorak.  Essentially

22   what it says is that that he was a good child.  He

23   had attention deficit disorder.  That his father left

24   when the mother was pregnant.  And that what he needs

25   is treatment.  And it is baffling and puzzling to her

1  the Department of Corrections is only concerned with

2  keeping her son in prison and punishing him on top of

3  what he has already been sentenced to.  There is also

4  a letter from Mr. Sebolt himself.  It is a detailed

5  history of his various requests for treatment.  And

6  he requests treatment again.  These letters, oddly

7  enough the one from the mother is not signed by

8  anyone.  Neither is the one from Mr. Sebolt.  They

9  do, however, have remarkably similar type face.  And

10  that is all I will have to say about those.

11       Do you want to look at these before I sentence him?

12       MR. JOHNSTONE:  No, Your Honor, we have no

13  objection.

14       THE COURT:  All right.

15       Those two letters will be received into evidence.  All right.

16  Let me hear from the government on the defendant's motion for a

17  variance; the defendant's motion for concurrent sentences, at least in

18  part; and the 3553(a) factors as applied in this case.

19       MR. JOHNSTONE:  Thank you, Your Honor.

20       The defendant is simply too dangerous to ever be released from

21  prison.  A view of the government's time line in its sentencing

22  position demonstrates how dangerous he is, and to children in

23  particular.  The defendant has victimized hundreds of children either

24  by personally molesting them or trafficking in child pornography or

25  soliciting others to sexually abuse children to produce pornography

1  for him.  What makes it more egregious is much of it was conducted

2  while he was sitting in a cell within the Bureau of Prisons.

3       The defendant says he wants treatment, and he wants to

4  rehabilitate himself.  But those words are mere lip service to this

5  court.  His true intentions lie in the letters that he writes to

6  others that he believes are beyond the prying eyes of the prison

7  officials and the government.  In those letters the defendant is

8  prideful of his exploitation of children.  He boasts of how many

9  children he has molested, how long he has molested them, and he brags

10  about his involvement in child pornography.  He encourages and cajoles

11  others to produce child pornography customized to his personal sexual

12  preferences.  Most importantly, he says he is not going to stop.  He

13  says he can't wait to get out and continue his exploitation of

14  children, either here or abroad.

15       The government understands that it is asking for a significant

16  sentence in this case, one that should be reserved for the worst

17  offenders.  But the defendant has proven himself to be among the worst

18  child sex offenders.  For 15 years he has engaged in a campaign to

19  exploit children either through actually molesting them or through

20  child pornography, or the production of child pornography.

21       The factors listed in 3553(a) demand a life sentence in this

22  case, and the government is asking The Court impose such a sentence.

23  At the very least, however, any sentence that The Court imposes must

24  in its entirety run consecutively to the defendant's previous sentence

25  for child pornography offenses.  Section 2251(e), the statute under

1   which the defendant was convicted, mandates the defendant receive not

2   less than 35 years in prison for this offense.  Likewise, section

3   5(g)1.3 of the U.S. sentencing guidelines states that if the instant

4   offense occurs while the defendant is serving a term of imprisonment,

5   the sentence imposed on the instant offense must run consecutively to

6   the undischarged term of imprisonment.  So allowing any portion of the

7   defendant's sentence in this case to run concurrently to his previous

8   sentence would violate both the letter and the spirit of 2251(e) and

9   the United States Sentencing Guidelines.

10      That said, The Court should reserve its mercy in this case for

11   defendants who merit it.  And unlike the defendant, who repeatedly

12   thumbs his nose at the criminal justice system and continues

13   undeterred in its criminal conduct, The Court should sentence the

14   defendant to life in prison.

15      THE COURT:  Do I have the authority -- I am not

16   going to do it in this case -- but do I have the

17   authority to make a sentence run concurrent with a

18   sentence he is already serving?

19      MR. JOHNSTONE:  Does The Court have the

20   authority?

21      THE COURT:  Yes.

22      MR. JOHNSTONE:  Your Honor, I mean, I think

23   based on the wording of the statute in this case and

24   the Sentencing Guidelines the sentence in this case

25   must run consecutively to --

1        THE COURT:  In general do I have the authority

2    to make it run concurrent?

3        MR. JOHNSTONE:  I think in general cases The

4    Court may have the discretion to run certain

5    sentences concurrently to others.

6        THE COURT:  Okay.  Thank you.

7        Mrs. Roberts?

8        MS ROBERTS:  Your Honor, let me first start by

9    saying that The Court specifically has the authority

10   to run a portion of the sentence concurrent should

11   The Court chose to do so, or find that it is

12   appropriate.

13       THE COURT:  Where does that come from?

14       MS ROBERTS:  First of all, the guidelines are

15   advisory.  And so under 5 -- by citing to section 5

16   G, the guidelines cannot place a mandate on The

17   Court --

18       THE COURT:  Right.

19       MS ROBERTS:  -- in that regard.  So certainly 5

20   G doesn't prohibit.  It discourages courts from doing

21   it.  But it does not prohibit a court from imposing a

22   concurrent sentence.

23       THE COURT:  Okay.

24       MS ROBERTS:  With regard to 2251(e), that

25   statute does not prohibit a court from running the

1    time concurrently.  There are other statutes that

2    specifically address the issue, and they say --

3         THE COURT:  Like the gun.  Possession of a gun.

4         MS ROBERTS:  Absolutely.  So therefore when,

5    along with the act, if it had been the legislative

6    intent that this must run consecutive, then they knew

7    how to say it.  They have said it in the past.  They

8    have said it since this time.  And certainly they

9    would have said it.

10        So The Court does have authority.  And it is not a stretch for

11   The Court to read its authority or to glean from the statute its

12   authority through the absence of a prohibition against concurrent

13   time.

14        THE COURT:  All right.

15        MS ROBERTS:  Your Honor, backing up, and just

16   talking about the case in general.  First of all, I

17   would like to say, there is nothing that I say this

18   morning -- I don't mean for my comments to in any way

19   diminish the seriousness of the offense, the danger

20   that is presented at this point based upon

21   Mr. Sebolt's prior convictions and based upon the

22   evidence that the government put forth at trial, and

23   which The Court obviously has accepted as proof

24   beyond a reasonable doubt.

25        Even while saying that, Your Honor, there are certain points that

1    should be brought to light.  The government is asking The Court to

2    impose life without the possibility of parole in this case.  For this

3    court to determine this day in 2013 that fifty years from now

4    Mr. Sebolt will continue to be a danger and therefore that he should

5    not be released, this court, while his history -- that is a history

6    absent any type of treatment -- while his history has shown that the

7    behavior is continued, there is still hope for change.  To sentence

8    someone, to sentence Mr. Sebolt, specifically, today to life

9    imprisonment gives no hope for change.  It underscores that should he

10   receive treatment at some point, or some access to some resources that

11   changes his behavior, that even with that there is no hope.  He will

12   never get out even, if he does a complete 180, that he will never be

13   released from prison.  And it is just not necessary.

14        Under 3553(a) factors it is more than is necessary to accomplish

15   those 3553(a) goals.

16        In my sentencing position I talked about the various safeguards

17   that are available.  And I think that it is not just paying lip

18   service.  I think that these are very real safeguards that can be put

19   into place.  Some of them more effective than others.  The one that I

20   think is of the greatest use, is the possibility, or the government's

21   ability to file for civil commitment at the end of Mr. Sebolt's stay.

22   He is right now 32 years old.  His -- by the time of his release

23   date -- the anticipated release date from the original offense is in

24   2028.  He will be 47 years old.

25        THE COURT:  47 when he is released from his

1    current sentence?

2         MS ROBERTS:  From his current sentence.  And

3    that is assuming that he doesn't lose any of the good

4    time as a result of his conduct during this period,

5    or this new conviction here.  It is not that the BOP

6    is being restricted from taking further action.  He

7    has been in the hole for over eleven months for this

8    offense.  There have been other BOP sanctions imposed

9    in this case.  But there is nothing that says that

10   the BOP sanctions won't continue and can't continue.

11   And certainly he returns to BOP custody with a

12   conviction for the conduct.  So that is definitely

13   one of the factors that BOP takes into consideration

14   when determining whether an individual really will

15   get benefit for the good time.

16        So the anticipated 2028 date was the date without consideration

17   of a review of good time credit.  He had during the course of this --

18   his behavior over the years, not for this offense but over the

19   years -- lost good time credit.  15 days, I think I recall seeing at

20   one point.

21        THE COURT:  For what?

22        MS ROBERTS:  15 days for having in his

23   possession contraband.  And on one of those occasions

24   I believe that the contraband was a magazine cutout,

25   but on other occasions it is whatever else might be

1   considered contraband by the BOP.  So certainly the

2   BOP has sanctioned Mr. Sebolt in the past for similar

3   conduct with the loss of good time credit.  There is

4   no reason to think that they would not consider doing

5   the same following a new federal conviction.

6        But then there is civil commitment.  And with the passage of the

7   Adam Walsh Act the government has in its power the ability to ask that

8   an individual who is being a sexually dangerous person be further

9   detained under a federal civil commitment statute.  That statute is 18

10  United States code section 4248.  That civil commitment is an

11  indefinite period of incarceration which follows on the heels of any

12  sentence that, any criminal sentence that has been satisfied.

13       As a part of that all that is necessary is that the BOP file a

14  notice certifying that they have in their custody an individual who

15  they believe is a sexually dangerous person.  The filing itself stays

16  any release until the matter can be reviewed in a court by a U.S.

17  District Court Judge who will hear evidence of, at that time, the

18  government's evidence as to Mr. Sebolt's conduct leading up to that

19  time period.  So not just what has happened today, but what happens in

20  fifty years or thirty-five years from today's date.  That court is in

21  a better position to make a determination as to whether or not

22  Mr. Sebolt really is someone who can't be trusted and who does warrant

23  incarceration for their natural life.

24       At that point, Your Honor, if The Court were to impose the

25  sentence requested, that is, that 180 months of the sentence be run

1    concurrent, Mr. Sebolt would be 65 years old at that determination.

2    That is twice his age right now.  I don't think it is unreasonable to

3    ask that a court postpone such a harsh and unyielding punishment until

4    another time where more facts and more evidence can be ascertained and

5    drawn.

6         In this case, Mr. Sebolt's history, there was no doubt in

7    anybody's mind that at the time that law enforcement discovered the

8    evidence of his 1997 offense, the 1997 through 1999 offenses, that

9    Mr. Sebolt presented a danger to the community, specifically to small

10   children.  There was also no doubt in anybody's mind that he needed

11   treatment and he needed change.  Each of the sentencing judges at

12   those original sentencings said as much during the sentencing hearing.

13        The judge sentencing Mr. Sebolt in the federal case specifically

14   suggested that he receive treatment immediately, and expressed that he

15   had no doubt that Mr. Sebolt would re-offend without treatment.  So

16   the fact that we were here today and everybody is so surprised -- and

17   I am not real sure why anybody is surprised that Mr. Sebolt has

18   continued in this behavior -- obviously, Your Honor, incarceration

19   without treatment is not the answer.

20        I am not suggesting, my request is not to let Mr. Sebolt go

21   today.  That would be preposterous.  He is not going into the

22   community, Your Honor.  He is not going into the community for at

23   least another 35 years.  But what I am asking The Court to recognize

24   is that up until this point, even though everyone knew that he needed

25   treatment to re-wire his thinking, that no such treatment

1    opportunities were afforded.

2         That even when the BOP psychologist recognized that he needed

3    treatment, that they said, well, but you can't get treatment at this

4    point.  We reserve that for the last three to five years of an

5    individual's stay.  So it is his release date that triggers BOP's

6    offer of treatment to him.  So if The Court were to impose the life

7    sentence, BOP would never afford treatment.

8         Now, the other thing is, maybe one might say well, at least we

9    know children are safe because Mr. Sebolt is not in the community.

10   But that is not true.  Because the instant offense that this court has

11   found him guilty of shows that you don't have to have direct contact

12   with a child in order to -- in order for that child to be the victim

13   of exploitation or molestation.  So it is important, even if

14   Mr. Sebolt were to spend the rest of his life in, his natural life, in

15   prison, it is important to get him treatment as soon as possible to

16   safeguard and to protect children.  So incarceration does not protect

17   the community in this realm.  It can't be contained by bars.

18        THE COURT:  Well, it is little safer with him in

19   jail than with him out on the street.

20        MS ROBERTS:  Well, surely, Your Honor, in the

21   sense that Mr. Sebolt would not be afforded an

22   opportunity to personally harm a child.  However,

23   based upon the evidence that the government presented

24   and The Court accepted as true, and proof beyond a

25   reasonable doubt, again, children are not -- are not

 1    necessarily any safer because he is incarcerated.

 2    You can't just -- I mean, at this point, Your Honor,

 3    he is hemorrhaging.  It is like nobody even put a

 4    band aid on it.  His behavior has increased, his

 5    sentence increased.  The BOP has, you know, attempted

 6    to do some things within, you know, within the

 7    facility to hamper.  He is being monitored with his

 8    mail right now.  None of that has made a difference.

 9    So you might say he is just completely pig headed,

10    but I would argue that this is an illness.  It is

11    defined as an illness by mental health professionals.

12    It is in the DSM 5, and DSM manuals prior, and

13    previous manuals, as well.  So I don't understand why

14    we are treating it like it is not an illness.  It is

15    a mental defect.  He needs cognitive re-wiring.  And

16    the government says that his request for help does

17    not ring true, that he is only doing this now to

18    avoid an additional period of incarceration.

19    Mr. Sebolt asked for help when he was interviewed by

20    these agents back in 2001, I believe it was.  He

21    asked for help at the time of sentencing when he was

22    sentenced in each of those prior convictions.

23    Mr. Sebolt asked for when he got in to the BOP.  He

24    never knew what his sentence was going to be.  But he

25    asked for help then.  And he asked for help again

1    even after his appeals had been denied and those

2    avenues were not going to result in his release.  But

3    he continued to ask for mental health treatment,

4    specifically for substance abuse treatment.  He asked

5    to be relocated to an institution that had effective

6    a sex-offender treatment program.  When he was denied

7    that he asked to be transferred to an institution

8    that had a sex-offender management program.  That is

9    how he got to F. C. I. Petersburg.  And he thought he

10   was going to F. C. I. Petersburg, and finally,

11   somebody was going to give him the help that he was

12   asking for, that he needed.  But when he got there

13   the program had not yet been set up.  And when it was

14   set up and implemented, he wasn't eligible for the

15   program.

16       He talked to a psychologist there and asked what could be done.

17   He was placed on a waiting list for that program.  And all of that

18   pre-dated the instant conduct.  All of that pre-dated this.  So it is

19   not a cry for help to avoid incarceration.  Obviously something, you

20   know, there has to be a different way of dealing with this.

21       Your Honor, in the sentencing position I also talk about

22   adolescent brain development.  I am sure that The Court has reviewed

23   that information there.  But the research shows that the adolescent

24   brain does not fully develop until the mid twenties.  That is the

25   latest information.  Mr. Sebolt's behavior began when he was a young

1   child.  And it continued through his teenage years.  Why is Mr. Sebolt

2   the way that he is?  I don't know.  I am not a professional.  But

3   certainly it should be considered.  Not as an excuse or a reason, not

4   to punish, but as a way to understand the behavior and therefore

5   effectuate change later.

6       To say that his family, that his family lacks insight, The Court

7   has the letter from his mom in which she talked about how he was

8   normal, how he was a good boy.  I am not sure whether or not she is

9   not aware of the specific details of his past, or if she is just

10  unable to appreciate the full magnitude of it, but certainly help was

11  not going to come from that avenue with those views.

12      There is some evidence that certain family members enable the

13  behavior by forwarding letters on.  And I just don't know what to make

14  of that.  Again, I think it shows a lack of insight on their part.

15  But I do not think that The Court should count that against

16  Mr. Sebolt.  It is simply one more thing to take into consideration, a

17  fact of one more time when help could have perhaps been extended but

18  was not understood.  And his family did not take an active role before

19  he came into the criminal justice system.

20      Your Honor, the guidelines here come out --

21      THE COURT:  360.

22      MS ROBERTS:  -- 360 months to life.  But with a

23  restricted guideline range of 420 months because of

24  the mandatory minimum.

25      Your Honor, both the guidelines and the mandatory minimum of 35

1    years is more than is necessary to accomplish the 3553(a) goals.

2         Going to the guidelines, his criminal history points, it is not

3    impermissible double counting.  It is also that from the beginning

4    that my argument is not that this is illegal or impermissible double

5    counting.  But his guidelines of 360 months were calculated based upon

6    his criminal history.  His criminal history consists solely of the

7    offenses which are the basis for the enhanced punishment of 35 years.

8    So I think The Court can take into consideration even with those

9    guidelines he is a criminal history category five.  So the guidelines

10   have taken into consideration his prior criminal history, his prior

11   offenses.  Then the legislature takes them into consideration and

12   imposes the mandatory minimum.  It seems a bit unfair.  I say that the

13   guidelines in this case are artificially high.  That even a sentence

14   of 360 months is not necessarily reasonable, or necessary, I would

15   say, to accomplish the 3553(a) factors.

16        I would ask The Court to seriously consider running the sentence,

17   imposing a sentence of 420 months with 180 months allowed to run

18   concurrent.

19        We will talk about supervised release, but the truth of the

20   matter is Mr. Sebolt has been incarcerated since he was 21 or 22 years

21   old.  If The Court allows the sentence to run concurrent he will be 65

22   years old.  So more than 40 years incarcerated.  I don't know he will

23   ever make it to his birthday if The Court were not to run it

24   concurrent, but wholly consecutive.  I don't know that he would make

25   it to -- I think that would make him 80.  80th birthday.

1    I guess what I am saying is, Your Honor, is even if The Court

2    imposes a sentence, the sentence that is -- that I am requesting, that

3    it could very well be a life sentence.  But to say life without the

4    possibility of parole is excessively harsh in this case.

5    I have provided The Court with some statistics and some

6    information about other sexual predators who have committed acts and

7    who were sentenced.  And in many, if not most, of those cases the

8    number of victims and the actual acts carried out were far more

9    egregious than those that The Court has, the facts that are currently

10   before The Court.  That is not to diminish that these are very serious

11   factors, just to say that the worst conduct has received lesser

12   punishment and it has been deemed effective and sufficient.

13   Also, Your Honor, there is statistics here about the average

14   murder sentence.  No one is dead here, yet the government is asking

15   for life incarceration.  I think to ask for life it should be reserved

16   for the absolute worst.  The absolute worst.  And at the end of the

17   day, Your Honor, the sentence that I am requesting on behalf of

18   Mr. Sebolt is not lenient, it is twice as great as the average

19   sentence imposed for rape or murder.

20   Those are in 2010 and/or 2011 statistics.  More than sufficient

21   to reflect the seriousness of the instant conduct.  What we are

22   punishing here, Mr. Sebolt created a flyer.  He intended that that

23   flyer be mailed out all across the world.  And as a result of the

24   flyer, that individuals would take pictures, perhaps, or send him

25   already existing pictures, that didn't specify, of children who had

1    been or were being sexually exploited.  That is reprehensible conduct

2    that nobody can stand behind.  However, at the end of the day, Your

3    Honor, to impose a sentence of an additional 20 years, consecutive 20

4    years for that conduct, is sufficient.  It reflects that it is a

5    serious offense; and also reflects, Your Honor, all of the other

6    factors that The Court is supposed to consider under the federal

7    sentencing factors.

8         THE COURT:  Okay.

9         MS ROBERTS:  The period of incarceration coupled

10   with, coupled with a life time of supervision and

11   other restraints and safeguards would be sufficient

12   but not greater than necessary to achieve all of the

13   sentencing goals.  And it would be a sentence that is

14   both humane and reflects the seriousness of the

15   offense.

16        THE COURT:  Thank you very much.

17        MS ROBERTS:  We ask The Court to impose the

18   sentence requested.

19        THE COURT:  Thank you, ma'am.

20        All right.

21        Mr. Sebolt, as I believe I mentioned to you earlier when you were

22   here last time, you have a chance now to stand up and tell me anything

23   that you want me to hear.

24        THE DEFENDANT:  Yes.  Good morning, Your Honor.

25        THE COURT:  Why don't you come up to the podium

1    so you can use the microphone.

2         THE DEFENDANT:  Good morning, Your Honor.

3         The punishment criteria for any sex offender treatment program

4    offered within the Bureau of Prisons requires that I be within the

5    last three to five years of my release date prior to acceptance to

6    have any of the programs.  Upon becoming aware of this admission

7    criteria, and in my endeavors to change my behaviors while

8    incarcerated, I have requested many times at four different

9    institutions to try to receive some kind of help.  But today, to date,

10   none, no help has been provided.  I have even considered filing a law

11   suit regarding that issue.  Had I been an alcoholic or drug addict, I

12   would have had an opportunity to possibly get help right away.

13        Now with the new sentencing looming over my head I don't know

14   when I will have the opportunity to get the help that I need.  Even

15   though I have become -- I have become exhausted in my attempts, I will

16   not give up.  I remain motivated and willing to receive help as soon

17   as a program becomes available.  My issues are a constant struggle, a

18   battle, that must -- that I must deal with every day.

19        In assisting me with my battle to overcome my issues I ask of

20   you, Your Honor, to become my advocate and I beseech you not to

21   prolong my opportunity for treatment.

22        Thank you.

23        THE COURT:  All right.  Thank you very much.

24        Well, let me review the 3553(a) factors.  And let me thank both

25   counsel for very able presentations on this.  Let me thank as well

1   Mr. Sebolt for an articulate statement as to what he is looking for.

2        First of all, the first factor I am to consider is the nature and

3   circumstances of the offense.  The nature and circumstances are that

4   while in prison for a child pornography charge and a molestation

5   charge running concurrently, Mr. Sebolt tried to get child pornography

6   and enlist others to help him get it.  He sent sample pictures of what

7   he wanted, drawings.  Among others, he asked impoverished people of

8   the third world to have their children be molested and to send him

9   photographs of that.  It is the worst of the worst.

10       Mrs. Roberts makes a point of comparing this to a sentence for

11  murder and rape.  These children who were victimized by what he is

12  asking people to do have to deal the rest of their lives with being

13  introduced to sexual conduct at an age when they are simply not

14  emotionally or even physically prepared for it.  That is -- we see

15  them here all the time.  That is like condemning someone to hell.

16       The history and characteristics of the defendant is the next

17  thing that I am to consider.

18       Well, his criminal history is that he has a prior child

19  pornography offense which gave him 30 years.  He has got a child

20  molestation offense which led to a long sentence in Illinois to run

21  concurrent with his federal time.

22       His personal history is that he essentially is from a good home.

23  His father was not present, but his mother was there and provided for

24  him and provided guidelines and discipline for him.  He had relatives

25  who served as father figures to him, especially his uncle.

1    He was not rich by any stretch of the imagination, but they did

2    have the essentials.  He has no dependents, and has not been married.

3    As far as his situation goes with respect to illnesses, I think the

4    only problem that he has is pedophilia.  He has no physical ailments

5    that I am aware of.

6         I share Mrs. Roberts' thoughts about this in at least one

7    respect, and that is, who knows what the world will hold in 30, 40, 50

8    years from now.  Maybe there will be some way to help people like

9    Mr. Sebolt change their sexual desires or actions.  We don't know that

10   right now, obviously.

11        But we do know what we have in front of us, and that is that he

12   currently engages in pedophilia, and if he is released he would

13   continue to engage in it.

14        He does not have a substance abuse problem with alcohol or drugs.

15   Although, I suppose that in a sense he has what some people might call

16   a sexual addiction.

17        His education is that he has a high school diploma and an

18   associate degree, college courses.  He has a profession in the

19   computer field, which essentially -- his ability to manipulate

20   computers has led him to where he is now, or led him to where he was

21   caught out in Illinois the first time, rather.  If I had to sum up his

22   character, this is what I would say.  Mr. Sebolt will do anything,

23   will ignore any harm to others, and will prey upon impoverished people

24   to get child pornography.  He even wants to have, admittedly wants to

25   have, sex with children, and clearly has thought about it in a way

1    that is somewhat sophisticated.  He says he will go to another country

2    where they look more favorably upon this kind of thing.

3        The next factors that I am to consider are the need for the

4    sentence to reflect the seriousness of the offense, promote respect

5    for the law, and provide just punishment.  Clearly it is a very

6    serious offense.

7        Clearly Mr. Sebolt, at least when he comes to his sexual conduct,

8    has no respect for the law.  I mean, he was already in prison for 30

9    some odd years, and then he goes off and comes up with this scheme to

10   send out letters to people using secret compartments in greeting

11   cards.  That is just thumbing his nose at the sentences that he has

12   already received and the law that forbids what he wants to do.

13       Just punishment.  I think justice in this case demands a long

14   punishment.

15       The next thing that I am to consider is the need for the sentence

16   to afford adequate deterrence.  Obviously that is critically important

17   here.  We don't want to have other people doing these kinds of

18   offenses.

19       Then we think about, talk about the need for the sentence to

20   protect the public from further crimes of Mr. Sebolt.  You know, there

21   are -- there is a pretty big universe of people who are victims of

22   Mr. Sebolt's crimes.  And we start, I start, at least, thinking back

23   to the witness who testified about -- who testified in his trial about

24   how they sat around in jail talking about things, a number of sex

25   offenders on the same unit.  Some of those people might actually be

1    trying to get over this, to get past this.  And when somebody sneaks

2    in contraband like this, like the pictures he wanted to bring in, it

3    just feeds their problems.  But that is a small part of the overall

4    universe of victims, because every child who is in one of those

5    pictures, pornographic pictures, is somebody whose life is just

6    completely, if not destroyed, seriously messed up. I can't think of

7    anything more important in this case than protecting the public from

8    further crimes of the defendant, who in this case has indicated that

9    when he gets out he wants to do more of the same.  In fact, in a way

10   he wants to do it while he is still in the prison.

11       All right.  The next factor is the need to afford the defendant

12   with education, vocational training, medical care and other treatment.

13   Well, obviously he needs offender treatment.  I will recommend in my

14   judgment in this case that the Bureau of Prisons start that

15   immediately so we don't have any repetition of the kind of problem we

16   had here.

17       I am to consider the kinds of sentences available.  Essentially

18   the maximum here is life.  The mandatory minimum is 420.  I can fine

19   him $250,000.  But I am going to find that he has no ability to pay a

20   fine, and will not impose a fine in this case.

21       I need to avoid sentencing disparities among similarly-situated

22   defendants.  I think anybody committing an offense like this in the

23   place where he committed it would expect a long and harsh sentence.

24   And he will receive one.

25       The need to provide restitution is the next factor that I am to

1   consider.  You know, ironically, people are damaged as badly by this

2   offense as by any offense.  And yet there is no opportunity to provide

3   restitution at all here.

4        There is a motion for a variance by the defendant.  The basis for

5   that is that he wants treatment.  He thinks his criminal history is

6   over-stated because his brain was not developed at the time of his

7   earlier offenses, and because compared to crimes like murder and rape

8   this is an excessive punishment.  That motion for a variance is

9   denied.

10       I appreciate and respect Mr. Sebolt's desire to have treatment.

11  I appreciate the fact that he began to do this when he had a -- not a

12  fully developed brain in terms of cognitive functions in terms of

13  judgment.  But none of that outweighs the need to protect the children

14  of our country and of the world from this man's predatory actions.

15       All right.

16       I believe that a sentence of life does not exceed the amount of

17  time necessary to achieve the goals of sentencing as set forth in 18

18  U.S. code section 3553(a).

19       The reasons that I am imposing that sentence are the ones that I

20  have already stated; that he shows no respect for the law, he shows no

21  willingness to give this stuff, this activity, up; and he is just a

22  danger to every child that walks the face of the earth.

23       He is unrepentant about it.  When he got up and asked for

24  treatment, he didn't say, I am sorry about what I did to those kids, I

25  am sorry about the fact that I wrote to third-world mothers and

1    fathers and asked them to get their kids to pose for pictures for me.

2    He didn't say, I am sorry to the Bureau of Corrections for bringing

3    this kind of thing inside the walls of the prison.  He wasn't sorry

4    for anything.  All he wanted was treatment.  That is why he is at the

5    very top range of the guidelines.

6        A sentence of life will reflect the seriousness of the offense,

7    promote respect for the law, provide just punishment for the offense,

8    afford adequate deterrence for criminal conduct, and protect the

9    public from further crimes that Mr. Sebolt may commit.  As such, a

10   sentence of life is punitive and will serve to promote respect for the

11   law as well as to punish and deter Mr. Sebolt.

12       Mr. Sebolt, please stand up.  Pursuant to the factors set fort in

13   18 U.S. code section 3553(a) and the Sentencing Reform Act of 1984,

14   and having considered the Federal Sentencing Guidelines as advisory,

15   it is the judgment of The Court that you are hereby committed to the

16   custody of the United States Bureau of Prisons to be imprisoned for a

17   term of life.  I recommend that as soon as you are taken back to the

18   Bureau of Prisons every effort is made to get you into a program that

19   will help you in whatever way is possible with this horrible

20   pedophilia situation that you suffer from.

21       If you should ever be released from prison you will be -- which I

22   can't imagine happening -- but if you are for some reason, you will be

23   on supervised release for life with the standard conditions,

24   participating in any mental health program recommended by the

25   probation office, and with no unsupervised contact with children.

1        I would ordinarily say that he would not be allowed to have

2   access to the internet, but, candidly, at the time he gets out, who

3   knows what there will be technologically for people to get their

4   information from.  So I am not going to include that.

5        And it may be that at that stage he will need to be wired in some

6   way to function in the world.

7        I have considered your net worth and liquid assets, your life

8   style and financial needs as reflected in the presentence report, your

9   earning potential, the dependents relying on your support, of which

10  there are none.  I find you are not capable of paying a fine.  No fine

11  will be imposed.  However, you do have to pay the special assessment

12  in the amount of one hundred dollars if you have not already done so.

13       Mr. Sebolt, you have 14 days to appeal this sentence to the

14  United States Court of Appeals for the Fourth Circuit.  In order to do

15  that you have to file what is called a notice of appeal.  You file it

16  with the district court clerk's office, this court, not the Court of

17  Appeals.  And, of course, you may proceed without paying a fee,

18  because you have no ability to pay.  Mrs. Roberts will file that for

19  you if you ask her to.  If you can't get a hold of her for some

20  reason, just send a letter to the clerk of the court saying you want

21  to appeal.

22       Anything else, counsel for the government?

23       MR. JOHNSTONE:  No, Your Honor.

24       THE COURT:  Anything else, Mrs. Roberts?

25       MS ROBERTS:  No, Your Honor.

1        THE COURT:  All right.

2        You are remanded to the custody of the United States Marshal,

3   sir.  I know it is -- this is a long time.  You have obviously got

4   some brains.  I hope that while you are in prison you will be able to

5   find a way to use your intelligence and your ability productively to

6   help others.  God bless you, sir.

7

8                    HEARING ADJOURNED

9

10     THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT.

11

12                GILBERT FRANK HALASZ, RMR
                   Official court reporter

13

14

15

16

17

18

19

20

21

22

23

24

25