No. _____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,
Plaintiff/Respondent

v.

PHILIP MICHAEL SEBOLT,
Defendant/Movant

MOTION TO VACATE, SET ASIDE, OR CORRECT A SENTENCE
PURSUANT TO 28 U.S.C. § 2255

Philip M. Sebolt
Reg. No. 14682-424
F.C.I. Terre Haute
P.O. Box 33
Terre Haute, IN 47808

Appearing Pro Se

MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
SENTENCE BY A PERSON IN FEDERAL CUSTODY

| **United States District Court** | District: Eastern District of Virginia |
|---|---|
| Name (under which you were convicted):<br>Philip Michael Sebolt | Docket or Case No.:<br>3:12-cr-33-JAG |
| Place of Confinement:<br>F.C.I. Terre Haute | Prisoner No.:<br>14682-424 |
| UNITED STATES OF AMERICA<br>V. | Movant (include name under which convicted)<br>Philip Michael Sebolt |

## MOTION

1. (a) Name and location of court which entered the judgment of conviction you are challenging: United States District Court for the Eastern District of Virginia (Richmond Division).

   (b) Criminal docket or case number (if you know): 3:12-cr-33-JAG

2. (a) Date of the judgment of conviction (if you know): July 9, 2014

   (b) Date of sentencing: July 9, 2014

3. Length of sentence: Life

4. Nature of crime (all counts): One count of mailing through the U.S. Mail an advertisement to receive or buy child pornography. (18 U.S.C. §2251 (d)(1)(A) and (e)).




5. (a) What was your plea? (Check one)
   (1) Not guilty [X]     (2) Guilty [ ]     (3) Nolo contendere (no contest) [ ]

   (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or what did you plead guilty to and what did you plead not guilty to? N/A

6.  If you went to trial, what kind of trial did you have?  (Check one)  Jury ☐  Judge only ☒

7.  Did you testify at a pretrial hearing, trial, or post-trial hearing?  Yes ☐  No ☒

8.  Did you appeal from the judgment of conviction?  Yes ☒  No ☐

9.  If you did appeal, answer the following:

(a) Name of court:  Fourth Circuit Court of Appeals.

(b) Docket or case number (if you know):  13-4093 (conv. & sent.), 14-4547 (sent.).

(c) Result:  13-4093 (conv. affirmed, sent. vacated), 14-4547 (sent. affirmed)

(d) Date of result (if you know):  13-4093 (2/11/2014), 14-4547 (2/3/2015).

(e) Citation to the case (if you know):  13-4093: U.S. v. Sebolt, 554 F. Appx. 200 (4th Cir. 2014); 14-4547: U.S. v. Sebolt, 2015 U.S. App. Lexis 1677 (4th Cir. 2015).

(f) Grounds raised:  13-4093: I. Whether the district court abused its discretion in admitting five pieces of evidence under FRE 404(b). II. Whether the sentence imposed was procedurally unreasonable where the guideline range was incorrectly calculated. 14-4547: I. Whether the district court committed procedural error by failing to consider a departure, as required by U.S.S.G. §5G1.1(b). II. Whether the district court committed substantive error by imposing a life sentence based on assumed future behavior.

(g) Did you file a petition for certiorari in the United States Supreme Court?  Yes ☒  No ☐

If "Yes," answer the following:

(1) Docket or case number (if you know):  14-7541 (conv.), 15-5279 (Sent.)

(2) Result:  All denied cert.

(3) Date of result (if you know):  14-7541 (Jan. 12, 2015), 15-5279 (Oct. 5, 2015).

(4) Citation to the case (if you know):  14-7541: Sebolt v. U.S., 135 S. Ct. 1017 (2015); 15-5279: Sebolt v. U.S., 2015 U.S. Lexis 6009 (2015).

(5) Grounds raised:  14-7541: Four questions presented concerning the admissiability of FRE 404(b) and decisions upholding the conviction. 15-5279: Two questions presented concerning the decision to uphold the life sentence as substantively reasonable.

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?

Yes ☐    No ☒

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court:   N/A _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐    No ☐

(7) Result: _____

(8) Date of result (if you know): _____

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court: _____

(2) Docket of case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐    No ☐

(7) Result: _____

(8) Date of result (if you know): _____

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1) First petition:        Yes ☐        No ☐

(2) Second petition:      Yes ☐        No ☐

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

_____

_____

_____

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the <u>facts</u> supporting each ground.

**GROUND ONE:**   Various Ineffective Assistance of Counsel Claims in Violation of the Sixth Amendment. (See Section A through H).

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

**A. COUNSEL WAS INEFFECTIVE PRIOR TO TRIAL BY FAILING TO INVESTIGATE, DISCOVER, AND INTRODUCE: (1) EXCULPATORY FORENSIC EVIDENCE CRITICAL TO ESTABLISHING AND PROVING SEBOLT'S ACTUAL INNOCENCE; AND, (2) IMPEACHABLE EVIDENCE THAT WOULD EVISCERATE THE CREDIBILITY OF GOVERNMENT EMPLOYED WITNESSES WHOM TESTIFIED ON BEHALF OF THE GOVERNMENT AT TRIAL.**

<u>Facts</u>

1. <u>Exculpatory Forensic Evidence Critical to Establishing and Proving Sebolt's Actual Innocence.</u>

1.        Sebolt met with Valencia D. Roberts, his court appointed defense counsel, on several occasions prior to trial throughout the months of March – May and again in August – September of 2012 at the Northern Neck Regional Jail where he was being housed. Sebolt Decl. ¶¶ 2-3. He also met with Lee Hush, a private investigator, and Gwen Jackson, a paralegal, both from the same office as Roberts, on several occasions

- 4 -

sometimes with only Roberts, and other times independantly. Id. The three
made up Sebolt's entire defense team.

2.     While reviewing the evidence against Sebolt in mid-March--
evidence of which Sebolt vehemently denies as being his,--Roberts tent-
itively mentioned of hiring a Forensic Document Examiner (F.D.E.) to
assist in Sebolt's defense. Sebolt Decl. ¶ 4. Her discussion included
an explanation of what those experts do. Id. She specifically explained
that the F.D.E. would obtain samples (exemplars) by having the subject
write sentences and words repetitively for later comparision and analysis
with the evidence in question. Id. Roberts assured Sebolt that funding
for such forensic analysis was of no issue. Id.

3.     Based on that conversation, Sebolt understood that the type
of forensic analysis she described would occur; that such analysis was
not only practical, but typical in establishing a defense in cases
involving handwriting forensics. Id.

4.     Since the inception of this case, Sebolt has, and continues
to, vehemently deny the allegations made against him. Sebolt Decl. ¶¶
5, 7, 8, 14. He has communicated this several times with both Roberts
and Hush. Id. In fact, in a meeting with Hush in April 2012, Sebolt
responded "no" when he was asked directly whether that was his hand-
writing on the letters/envelopes. Id. at ¶ 5.

5.     At no time during the pendency of the case has Sebolt ack-
nowledged that he was the author of the evidence against him or that he
had any involvement in the criminal act charged against him. Sebolt
Decl. ¶ 10.

6.     Prior to the May 9, 2012, status hearing, Roberts confirmed
with Sebolt that she hired Alan T. Robillard, a Forensic Document
Examiner (F.D.E.), for the limited purpose of making the same comparis-

ion of the questioned exhibits that the government's Forensic Expert had done. Sebolt Decl. ¶ 6. Sebolt did not disagree, however, based upon prior discussions, he believed that Robillard would also obtain samples for ultimate comparision to the evidence in question. Id.

7.     In an August 6, 2012 meeting with Roberts, Sebolt was informed that Robillard had completed a forensic handwriting analysis and had reached a conclusion. Sebolt Decl. ¶ 7. Roberts also informed Sebolt that she and Robillard discussed the case. Id. Within that discussion, according to Roberts, Robillard inquired as to whether he would be sampling Sebolt's handwriting. Roberts stated to Robillard that such would not occur unless Sebolt was insisting upon it. Id. In response to that conversation, Sebolt again vehemently denied the allegations and insisted that his counsel persue a full handwriting analysis. Id.

8.     Despite Sebolt's insistance on what he believed was supposed to occur, Roberts stated to Sebolt that she would rather perform a DNA analysis on the evidence as that would be less costly. Id. She gave Sebolt some time to consider it. Id.

9.     On August 21, 2012, Sebolt met with Hush to discuss the findings regarding the interviews Hush conducted with prospective witnesses. Sebolt Decl. ¶ 8. Included in that discussion was a brief conversation with regard to Robillard's forensic analysis. Id. Sebolt again vehemently denied the allegations and again insisted that Robillard conducted a full handwriting analysis. Id. Hush stated that he would discuss such request with Roberts. Id.

10.     Two weeks prior to trial, Sebolt again met with Roberts where Sebolt **again** insisted on having Robillard conduct a full handwriting analysis. Sebolt Decl. ¶ 9. With little explanation, Roberts made it clear that such an analysis would be too costly, not beneficial,

and that she'd rather do DNA. Id. She further stated to Sebolt that he
did not have a say-so as to whether an expert would be hired for his
defense. Id.

11.     Nothing further was said prior to trial with respect to
Sebolt's persistant insistance on conducting a full and proper forensic
analysis that would have undoubtedly vindicated Sebolt of the charge.
Id. Instead, Roberts stood with Sebolt at the defense table without
a defense, only leaning on the hope that the government could not prove
each element beyond a reasonable doubt.

12.     Following trial, however, Roberts admittingly acknowledged,
in her opinion, that Sebolt's handwriting differs from that of the
writing on the evidence. Sebolt Decl. ¶ 12.

13.     At sentencing, Sebolt was going to bring Roberts' failure
to the attention of the Court but stopped short fearing he would under-
cut a favorable sentence. Sebolt Decl. ¶ 13. When Roberts became privy
to Sebolt's proposed statements, she rebuked Sebolt and accused him
of attempting to find recourse in a § 2255 motion and discouraged him
from proceeding forward with such a motion by stating that he would
lose. Id.

14.      Roberts' decision to forego a full handwriting analysis on
the basis of cost and preference to a less costly DNA analysis despite
Sebolt's persistant insistance, stead-fast proclamation of innocence,
and Roberts' acknowledgement of differing penmanships, was so deplorably
unreasonable, that it clearly amounts to a deficient standard of per-
formance such that relief should be granted on this claim alone.

15.     Sebolt was prejudiced in such a way that he was deprived
by his own counsel of his constitutional right to present a defense at
trial. Such defense would have provided all reasonable doubt that

Sebolt did not author the flyer and would have led to an acquittal.
As a consequence to Roberts' omissions, Sebolt will, at this juncture,
spend the rest of his life behind bars as an innocent man.

2. **Impeachable Evidence That Would Have Eviscerated the Credibility of Government Employed Witnesses Whom Testified on Behalf of the Government at Trial.**

16.   At Sebolt's trial, the government called seven (7) witnesses to testify on the behalf of the government, five (5) of whom were employed by the Federal Bureau of Prisons. They were: Heather McWilliams, Wendall Crooms, Jermane Jones, Scott J. Bernardo, and Mercedes Carroll.

17.   Through discovery, trial counsel Valencia D. Roberts became aware very early on as to whom the government's prospective witnesses were that would testify in Sebolt's trial.

18.   In the course of pretrial investigation and discovery, to the best of Sebolt's knowledge and belief, Roberts failed to obtain the personnel records of potential government witnesses of whom were employed by the Federal Bureau of Prisons, for examination of conduct described below that would have been used to impeach those witnesses at trial.

19.   Such records may contain the following information: (a) investigations for violating, or disciplinary sanctions imposed for violating, any of the disciplinary codes listed in Attachment A of FBOP Program Statement 3420.11, Standards of Employee Conduct, including, but not limited to, misconduct, deceit, perjury, harassment, retaliation, discrimination, favortism, abuse (sexual or otherwise), sexual assult/misconduct, or excessive force/restraint while in the capacity of official duties; (b) any known history of using intoxicants, and/or recreational drugs; (c) any known mental illnesses that affected and/or impaired their performance in the capacity of official duties;

(d) any investigation for, or committed acts of, the introduction of contraband as described and defined by 28 C.F.R. § 500.1(h); (e) any known off-duty arrests and/or convictions, whether misdemeanor or felony; (f) any history of mishandling, fabricating, or tampering with evidence, whether of an administrative disciplinary proceeding or a criminal prosecution; and, (g) any known criminal and/or civil actions, past or pending, where such employee appear, or have appeared, as defendants.

20.     In addition, the government called Jose Negron, whom is also employed by the Federal Bureau of Prisons, to testify for the behalf of the government at Sebolt's sentencing hearing.

21.     Roberts was not only aware that Negron was a potential government witness at sentencing at least a month in advance, it was expected; Roberts challenged the authentication of a letter, purportedly written by Sebolt, post-trial, that was described in an amended Pre-Sentence Report.

22.     As like the others, Roberts failed to obtain and examine the personnel records of Jose Negron for any indication of conduct described above that would be used to impeach Negron.

23.     Roberts' failure to obtain, by subpoena Duces Tecum, the personnel records of each government witness employed by the Federal Bureau of Prisons for inspection of any such conduct described above for impeachment purposes, was completely unreasonable such that it clearly amounts to a deficient standard of performance.

24.     The conduct described above, if present, would have been used to impeach the witness(es). Thus, Sebolt was prejudiced by Roberts' failure.

B. <u>COUNSEL WAS INEFFECTIVE AT TRIAL BY FAILING TO OBJECT TO: (1) THE</u>
<u>ADMISSIBILITY OF EVIDENCE UNDER F.R.E. 404(b) THAT WAS UNRELIABLE;</u>
<u>(2) EVIDENCE UNDER F.R.E. 404(b) THAT WAS WRONGFULLY ADMITTED AS</u>
<u>IT WAS NOT AN ACT COMMITTED BY SEBOLT; AND, (3) LAY OPINION</u>
<u>TESTIMONY THAT WAS ERRONEOUSLY PRESENTED GIVEN THE FACT THAT THE</u>
<u>GOVERNMENT FAILED TO ESTABLISH ANY FOUNDATION AS REQUIRED BY F.R.E.</u>
<u>901(b)(2) AND 701.</u>

Facts

1. <u>The Admissibility of Evidence Under F.R.E. 404(b) That Was</u>
<u>Unreliable.</u>

1.    Days prior to trial, the government filed its notice of
intent to introduce five (5) pieces of prior bad act evidence at trial--
evidence purportedly authored by Sebolt--under F.R.E. 404(b) for the
purpose of establishing the identity and proof that Sebolt authored
the advertisement (flyer). Gov'ts Notice (Dkt. 24). That evidence
consisted of: (a) December 2008 letter and card from Sebolt to Buddhika
Jinadari in Sri Lanka, (b) December 2008 letter, card, photo from Roda
Tekeste to Sebolt, (c) two (2) July 2006 letters from Sebolt to book
publishing companies; and, (d) March 2007 letter from Sebolt to Candy
Brown. Id. at pp. 3-5.

2.    Trial counsel Valencia D. Roberts filed a motion in limine
to exclude said evidence. Dfts Motion In Limine (Dkt. 27). Arguments
were heard on the day of trial. Trial Tr. pp. 2-26.

3.    Evidence admitted under Rule 404(b) must meet four
criteria: The evidence must be relevant to an issue other than estab-
lishing the general character of the defendant, (b) must be necessary
and probative of an essential element, (c) must be reliable; and (d)
must not be outweighed by confusion or unfair prejudice. <u>United States</u>
<u>v. Queen</u>, 132 F.3d 991, 995 (4th Cir. 1997).

- 10 -

4.      Roberts' arguments focused exclusively on the first two criterias, the relevancy and necessity of the evidence, but did not at all contest the reliability of the evidence, the third prong of the Queen test. The trial court ultimately found said evidence admissible; relevant and necessary to prove identity. Trial Tr. pp. 25-26

5.      Roberts was given the opportunity to renew her in limine motion following the presentation of the government's case-in-chief but did not do so, thus failing to contest the admissibility of such evidence on the basis of reliability even at that stage in the proceeding. Trial Tr. pp. 25-26, 197-198.

6.      There is no reliable indication, even by a preponderance of the evidence, that Sebolt committed the prior bad acts:

* First, none of the witnesses whom introduced said evidence ever witnessed Sebolt, either in person or through electronic surveillance, place said evidence into the unit mail depository for delivery.

* Second, any lay opinion testimony that Sebolt authored said evidence is negated by the fact that none of the witnesses ever actually witnessed Sebolt write anything; the said evidence or otherwise.

* Third, Heather McWilliams, in her testimony at trial, admitted to the fact that any inmate can easily obtain other inmate's names and registration numbers from lists posted in the housing units. Trial Tr. pp. 49-51.

* Finally, Scott J. Bernardo, in his testimony at trial, admitted to the fact that there was an identified problem with inmates using other inmate's info (name and registration number) to mail letters out of the facility prior to the implimention of

- 11 -

the TRULINCS system and the requirement of mailing labels (Trial

Tr. p. 119); a system and requirement not in effect at the time

of the commission of the offense. Trial Tr. p. 116.

7.    Without any indication that Sebolt actually authored any

of the introduced 404(b) evidence, such evidence cannot possibly stand

as reliable, thus it is inadmissible.

8.    Roberts' failure to object to the admissibility of said

evidence on the basis of its reliability is completely unreasonable

such that it clearly amounts to a deficient standard of performance.

9.    Roberts' failure prejudiced Sebolt in such a way that not

only did the admission of each piece of evidence cause unfair prejudice

to Sebolt at his trial, each only served to emphasize Sebolt's bad char-

acter and propensity to commit crimes against children; evidence of which

the trier-of-fact wholly relied upon in order to erroneously identify

and convict Sebolt. Trial Tr. pp. 213-214.

## 2. Evidence Under F.R.E. 404(b) That Was Wrongfully Admitted as it Was Not An Act Committed by Sebolt.

10.    One particular piece of evidence that was introduced at

Sebolt's trial under Rule 404(b) was a letter addressed to Sebolt

from Roda Tekeste in December 2008. Trial Tr. pp. 43-46. The contents

of the envelope also contained a greeting card along with a note and

photo of a toddler lasciviously exposing her genitals that was hidden

inside a secret compartment of the greeting card. Id. at pp. 44-45.

The envelope and its contents were intercepted and consficated by the

SIS staff without Sebolt's knowledge. Id. p. 46. Sebolt was not discip-

lined. Id.; and pp. 51-52.

11.    This particular piece of evidence is not admissible under

Rule 404(b) as it is not an act committed by Sebolt. Nor is there any

evidence or indication that Sebolt ever requested from Tekeste such

photo, or that Sebolt had any prior interaction or communication with Tekeste. Nor did the government produce Tekeste at trial as a witness.

12. Roberts' failure to object to the admissibility of said evidence was completely unreasonable such that it clearly amounts to a deficient standard of performance.

13. Sebolt was prejudiced in such a way that not only did the admission of such piece of evidence cause unfair prejudice to Sebolt at his trial, it only served to emphasize Sebolt's bad character and propensity to commit crimes against children; evidence of which the trier-of-fact wholly relied upin in order to erroneously identify and convict Sebolt. Trial Tr. pp. 213-214.

### 3. Lay Opinion Testimony That Was Erroneously Presented as The Government Failed to Establish Any Foundation as Required by F.R.E. 901(b)(2) and 701.

14. The government, through its witnesses at trial, did not, nor could, establish a foundation with respect to any lay opinion testimony as to Sebolt's handwriting as required by law.

15. The government witnesses, whom testified at Sebolt's trial in a lay opinion capacity (Heather McWilliams, Scott J. Bernardo), had never actually witnessed Sebolt write anything, whether as to the evidence they testified to, or to the outgoing mail they said they became familiar with in the course of monitoring Sebolt's mail. In fact, the admission by Heather McWilliams that any inmate can easily obtain other inmate's names and registration numbers from lists posted in the housing units (Trial Tr. pp. 49-51), in conjunction with the admission by Scott J. Bernardo that there was an identified problem with inmates using other inmate's info (name and registration numbers) to mail out of the facility (Trial Tr. p. 119), severely undercuts and negates the integrity of any attempts to establish a foundation as required.

16.     Robert's failure to object to, or move to strike, any lay opinion testimony with respect to the handwriting on the evidence introduced at trial, on the basis that the government failed to estab-lish a foundation as required, was completely unreasonable such that it clearly amounts to a deficient standard of performance.

17.     Sebolt was prejudiced in such a way that the entire crux of the government's case rested upon the testimony of witnesses in their lay opinion capacity in order to identify and convict Sebolt. Trial Tr. pp. 20-21, 23, 203.

C. COUNSEL WAS INEFFECTIVE BY FAILING TO INVESTIGATE, DISCOVER, AND ULTIMATELY INTRODUCE, IN A POST-TRIAL RULE 33 NEW TRIAL MOTION: (1) EXCULPATORY FORENSIC EVIDENCE CRITICAL TO ESTABLISHING AND PROVING SEBOLT'S ACTUAL INNOCENCE WHICH WOULD HAVE LED TO A REVERSAL OF THE CONVICTION AND VINDICATION OF THE CHARGE; AND, (2) IMPEACHABLE EVIDENCE EVISCERATING THE CREDIBILITY OF GOVERNMENT EMPLOYED WITNESSES WHOM TESTIFIED ON THE BEHALF OF THE GOVERNMENT AT TRIAL.

FACTS

1. Exculpatory Forensic Evidence Critical to Establishing And Proving Sebolt's Actual Innocence Which Would Have Led to a Reversal of the Conviction and Vindication of the Charge.

1.     Sebolt incorporates herein by reference the facts stated in ground I.A.1. of this motion.

2.     By the time of trial, counsel Valencia D. Roberts was well aware that Sebolt did not commit the offense as charged. Nevertheless, Sebolt went head first into a trial with no defense and all odds stack-ed against him.

3.     Proof of Sebolt's innocence depended upon forensic testing by a qualified expert versed in scientific knowledge and methods.

4.      Despite Roberts' awareness and knowledge of Sebolt's inno-
cence, as well as her acknowledgement that Sebolt's handwriting differs
in comparison to the handwriting on the evidence (Sebolt Decl. ¶ 12),
she failed to investigate, discover, and introduce exculpatory evidence
for presentation in a Rule 33 motion by not engaging in proper forensic
testing of Sebolt's handwriting. Such evidence would have proved Sebolt's
innocence, thereby reversing his conviction and vindicating him of the
charge.

5.      Likewise, Sebolt's resentencing counsel, Mark K. Tyndall,
also failed to investigate, discover, and introduce exculpatory
evidence for presentation in a Rule 33 motion by not engaging in
proper forensic testing of Sebolt's handwriting.

6.      Tyndall became aware of Sebolt's innocence during a jail-
house visit prior to the July 9, 2014 resentencing hearing. Sebolt Decl.
¶   . Tyndall starkly declined to assist Sebolt even before Sebolt
could formally request such representation. Id. The conversation began
when Sebolt inquired of the costs associated with forensic testing of
handwriting. Id.

7.      The deplorable omissions by Roberts, and then by Tyndall,
are unexcusable. Such unreasonableness clearly amounts to a deficient
standard of performance that of which prejudiced Sebolt by foreclosing
his final opportunity to present a defense of actual innocence with
the absolute right to representation of counsel for Rule 33 motions.

2. Impeachable Evidence Eviscerating the Credibility of
   Government Employed Witnesses Whom Testified on the
   Behalf of Government at Trial.

8.      Sebolt incorporates herein by reference the facts stated
in ground I.A.2. of this motion.

9.      Following trial and sentencing, Valencia D. Roberts, as

- 15 -

well as Mark K. Tyndall, were well aware as to whom testified on the behalf of the government at trial and the first sentencing hearing. Specifically, they were aware that a total of Six (6) whom testified were employed as government employees with the Federal Bureau of Prisons.

10. Roberts and Tyndall both failed to obtain the personnel records of those employees for examination of conduct described in section I.A.2. ¶ 19 for presentation as impeachable evidence brought forth in a Rule 33 motion.

11. The deplorable omissions by Roberts, and then by Tyndall, are unexcusable. Such unreasonableness clearly amounts to a deficient standard of performance that of which prejudiced Sebolt by foreclosing his final opportunity to impeach the government employed witnesses whom testified on the behalf of the government at trial and sentencing.

## D. COUNSEL WAS INEFFECTIVE AT SENTENCING BY FAILING TO OBJECT TO THE INCLUSION OF HIGHLY PREJUDICIAL, UNAUTHENTICATED, AND UNPROVEN FACTS DELINEATED IN THE PSR THAT WRONGFULLY ENHANCED SEBOLT'S SENTENCE TO LIFE IMPRISONMENT.

### Facts

1. Sebolt was re-sentenced on July 9, 2014 following a vacator and remand of the first sentencing hearing on January 28, 2013 by the Fourth Circuit Court of Appeals. Dkt. 68, 53.

2. At re-sentencing, the government moved for an upward departure pursuant to U.S.S.G. § 4A1.3 so as to increase Sebolt's criminal history category from IV to V. Gov'ts Mot. For Upward Departure and Variance (Doc. 64) at pp. 1-2. The government also moved for an upward variance in order to achieve a sentence range of 420 months to life imprisonment. Id.

3. The Court denied the government's motion for departure, but

granted the request for an upward variance and ultimately imposed a life sentence from what would have been a restricted guideline sentence range of 420 months to 420 months. Re-sentencing Tr. (Doc. 77) pp. 14, 31.

4.     In the Court's 18 U.S.C. § 3553(a) analysis, and as its sole basis for varying upward, the Court wholly relied upon unauthenticated, unproven, and highly prejudicial facts contained within the PSR to justify a sentence of life imprisonment. Id. pp. 31-32.

5.     Specifically, the Court based its upward variance on Sebolt's propensity and intent to commit criminal acts 50 or so years[1] into the future upon his release from custody, thus exhibiting a danger to others. Id. The Court arrived at its conclusion by relying on facts adduced from a letter Sebolt purportedly wrote to another inmate in Illinois where he boasts and brags about sexual acts he claims to have committed, as well as plans to commit upon release from custody. Id. at pp. 29-30. Those facts are stated in the PSR (Doc. 32) at ¶ 14.

6.     Sebolt's re-sentencing counsel, Mark K. Tyndall, became well aware of the facts stated in ¶ 14 of the PSR long before the July 9, 2014 re-sentencing hearing. Not only did he review the PSR, Tyndall in fact argued against those facts in his Position With Respect to Sentencing Factors (Doc. 66 at pp. 3-4), in opposition to the Government's Motion For Upward Departure and Variance (Doc. 64 at pp. 16-17, 21).[2] Moreover, Sebolt even requested Tyndall, both written and verbally, to object to such fact, among others. Sebolt Decl. ¶   . Finally, the government discussed the conduct adduced in the PSR at ¶ 14 at Sebolt's

---

1. Assuming the Court would have imposed the mandatory minimum of 35 years consecutive to Sebolt's previously undischarged sentence, Sebolt would have had an approx. 50 years remaining on his aggregate sentence prior to release at the time of his re-sentencing hearing.

2. Tyndall's arguments were made in a broad sense and only to the extent of contesting the application of U.S.S.G. § 4A1.3 departure as to Sebolt's uncharged, uncorroberated conduct.

re-sentencing hearing. Re-sentencing Tr. p. 19.

7.      Completely aware of those facts, Tyndall failed to object to, and contest, the authenticity and reliability of the untried facts found in ¶ 14 of the PSR, as discussed above on the basis of Federal Rules of Evidence 901, as well as in violation of <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000); <u>Alleyne v. United States</u>, 133 S.Ct. 2151 (2013).

8.      As explained to Sebolt, it was Mr. Tyndall's strategy or tatic to throw Sebolt's life at the mercy of the Court by simply ignoring incriminating, damaging facts with the hope that such would not be utilized or spoken about rather than plausably objecting to and contesting such facts. Sebolt Decl. ¶  . However, such cannot be said to be reasonable in Sebolt's best interests; especially in the light of the fact that those facts were argued by the government and utilized by the Court in justifying a sentence of life imprisonment.

9.      Likewise, sentencing counsel, Valencia D. Roberts, is equally responsible. Not only did she review the PSR, she lodged two objections, one of which was in reference to the facts contained in the addendum of the PSR at ¶¶ 72-74, out of concern that such unauthenticated, unproven facts would be used by the government and the Court to justify an enhanced sentence upon an 18 U.S.C. § 3553(a) analysis. Dfts' Objections to PSR (Doc. 36) at p. 1 and n.1.

10.      There can be no excuse, nor any reason of strategy or tatic as to Roberts' failure to object to and contest the authenticity and reliability of the untried facts found in ¶ 14 of the PSR as discussed above on the basis of F.R.E. 901, as well as in violation of <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000).

11.      In fact, Roberts' deficient performance is evinced by the

fact that she refused to object to several guideline enhancements that Sebolt requested (as well as other facts, whether trivial or not), one of which was reversed on plain error standard of review at Sebolt's first direct appeal (U.S.S.G. § 4B1.5). Sebolt Decl. ¶  ; See also United States v. Sebolt, 554 Fed. Appx. 200, 207 (4th Cir. 2014).

12.    Owing a duty under the Sixth Amendment to vigorously defend Sebolt's best interests at his sentencing hearings, the omissions by Tyndall and Roberts jointly and severally were unreasonable that it amounts to a deficient standard of performance.

13.    Such omissions prejudiced Sebolt substantially by allowing the Court to starkly increase Sebolt's sentence to life imprisonment from an otherwise restricted guideline sentence of 420 months (35 years) based upon facts that were otherwise inadmissible. Re-sentencing Tr. pp. 31-33.

## E. COUNSEL WAS INEFFECTIVE AT SENTENCING BY FAILING TO RAISE AND ARGUE THE AMBIGUIETY AND INAPPLICABILITY OF THE RECIDIVIST ENHANCEMENTS UNDER 18 U.S.C. § 2251(e) WHICH RESULTED IN AN INCREASE TERM OF IMPRISONMENT.

### Facts

1.    Sebolt was convicted of one (1) count of advertising for receiving and buying of child pornography under 18 U.S.C. § 2251(d)(1)(A). That conviction subjected Sebolt to an imposition of a sentence under paragraph (e) of § 2251.

2.    Title 18 U.S.C. § 2251(e) provides for a multi-tired sentencing approach depending upon the existance of prior convictions for certain federal and state sexual offenses in a person's background. Such enhancements are known as the recidivist enhancements.

3.    At a minimum, paragraph (e) subjects a person to "imprison-

- 19 -

[ment] not less than 15 years nor more than 30 years [.]" However, "if such person has one prior conviction under [chapter 110], section 1591, chapter 71, chapter 109A, or chapter 117, or under section 920 of title 10 (article 120 of the Uniform Code of Military Justice), or under the laws of any State relating to aggravated sexual abuse, sexual abuse, abusive sexual contact involving a minor or ward, or sex trafficking of children, or the production, possession, receipt, mailing, sale, distribution, shippment, or transportation of child pornography, such person shall be...imprisoned for not less than 25 years nor more than 50 years [.]".

4.      Finally, paragraph (e) provides for a second and final recidivist enhancement "if such person has 2 or more prior convictions under [chapter 110], chapter 71, chapter 109A, or chapter 117, or under section 920 of title 10 (article 120 of the Uniform Code of Military Justice), or under the laws of any State relating to the Sexual exploitation of children, such person shall be...imprisoned not less than 35 years nor more than life." (emphasis added).

5.      Sebolt has two predicate offenses in his criminal history. This includes a federal conviction in 2004 for the possession and distribution of child pornography and advertising for the production of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B), (a)(1), and § 2251(d)(1)(A).[3] Trial Tr. pp. 192-193. Sebolt was also convicted in 2006 in the State of Illinois of Predatory Criminal Sexual Assault of a Child in violation of 720 ILCS 5/12-14.1(a)(1). Id.

6.      Because Sebolt's conviction in the State of Illinois did not involve the production of child pornography (or any other child pornography related offense) in the commission of the offense, Sebolt's

3. Formerly § 2251(c)(1)(A) prior to April 30, 2003. See Pub. L. No. 108-21, § 506(2)(2003).

- 20 -

predicate state conviction cannot trigger the "two or more priors" enhancement within the meaning of "relating to the sexual exploitation of children." Thus, it was incorrect for Sebolt to fall within the sentence range of 35 years to life.

7.   Rather, Sebolt's sentence must fall within the 25 to 50 years sentence range as either of Sebolt's predicate convictions trigger the "one prior conviction"; the federal conviction as that is a prior conviction under chapter 110 OR the State of Illinois conviction as that is a conviction under the law of [Illinois] relating to the "aggravated sexual abuse, sexual abuse, abusive sexual contact involing a minor [.]".

8.   Nowhere in Title 18 U.S.C. § 2251 or in Chapter 110, has Congress defined the language "sexual exploitation of children." Thus, because paragraph (e) of § 2251 is ambiguous and leaves open for interpretation, Sebolt must benefit under the rule of lenity doctrine.

9.   Neither trial counsel, Valencia D. Roberts, nor re-sentencing counsel, Mark K. Tyndall, raised this issue at sentencing despite Sebolt's request to do so. Sebolt Decl. ¶   .

10.   Owing a duty under the Sixth Amendment to vigorously defend Sebolt's best interests at his sentencing hearings, the omissions by Tyndall and Roberts jointly and severally are so unreasonable that it undoubtedly amounts to a deficient standard of performance.

11.   Such omissions prejudiced Sebolt substantially by permitting the Court to astronomically increase Sebolt's sentence to life imprisonment; a sentence far greater than the allowed statutory maximum of 50 years.

- 21 -

F. <u>COUNSEL WAS INEFFECTIVE AT SENTENCING BY FAILING TO: (1) MOVE</u>
<u>FOR CONSIDERATION OF A SENTENCE THAT WOULD ACCOUNT FOR THE NEED</u>
<u>TO AVOID UNWARRANTED SENTENCE DISPARITIES PURSUANT TO 18 U.S.C.</u>
<u>§ 3553(a)(6); (2) CHALLENGE THE LIFE SENTENCE IMPOSED AS VEHEMANTLY</u>
<u>DISPROPORTIONATE TO THE SEVERITY OF THE OFFENSE IN VIOLATION OF</u>
<u>THE EIGHTH AMENDMENT; AND, (3) RAISE AND ARTICULATE A CLAIM THAT</u>
<u>THE PRODUCTION-LIKE SENTENCING SCHEME IN § 2251(e) IS GROSSLY</u>
<u>DISPROPORTIONATE TO THE OFFENSE CONDUCT OF SOLICITATION TO</u>
<u>'RECEIVE' AND 'BUY' CHILD PORNOGRAPHY--DIVISIBLE ELEMENTS</u>
<u>DELINEATED IN § 2251(d)(1)(A)-IN VIOLATION OF THE EIGHTH AMENDMENT.</u>

Facts

### 1. <u>Consideration of A Sentence That Would Account For the Need</u> <u>to Avoid Unwarranted Sentence Disparities.</u>

1.      When formulating a sentence, the District Court must
"impose a sentence sufficient, but not greater than necessary, to
comply with the purpose set forth in paragraph (2)" of 18 U.S.C.
§ 3553(a). In so doing, the Court must consider the factors deliniated
in 18 U.S.C. § 3553(a)(1)-(7). One of those factors is the "need to
avoid unwarranted sentence disparities among defendants with similar
records who have been found guilty of similar conduct." Id. § 3553(a)
(6).

2.      On July 2, 2014, then re-sentencing counsel, Mark K.
Tyndall, submitted a scant document entitled "Defendant's Position
with Respect to Sentencing Factors." Doc. 66. Although he adopted pages
3-15 of "Defendant's Objections to PSR and Motion for Non-Guideline
Sentence" previously filed by trial/sentencing counsel, Valencia D.
Roberts on January 21, 2013, (Doc. 36), Mr. Tyndall failed to raise
and articulate a sentence that would account for the need to avoid
unwarranted sentence disparities. Specifically, he did not set forth
facts evincing similarly situated defendants as to Sebolt with similar
records who have been found guilty of similar conduct. Nor did he

provide any argument on this point when asked to address the Court as to the government's upward variance motion at the re-sentencing hearing. Re-Sentencing Tr. pp. 20-25.

3.      Although Ms. Roberts did, to a certain extent, point out and articulate other cases in which those defendants have committed criminal acts far more egregious than that of Sebolt whom received far less than a life sentence, none of those defendants are similarly situated to Sebolt. Dft's Mot. For Non-Guideline Sent. (Doc. 36) pp. 12-14; See also, First Sentencing Tr. (Doc. 48) pp. 39-40.

4.      Had Mr. Tyndall (or Ms. Roberts) engaged in some research, their research would have revealed that there are defendants similarly situated to Sebolt with similar (or worse) records who have been found guilty of similar (or worse) conduct that received far less than life imprisonment.

5.      Sebolt, however, was ultimately sentenced to life imprison- ment, far greater than that of his comparator(s). Had Mr. Tyndall pre- sented such facts, the Court would have had an opportunity to seriously consider the sentences of similarly situated defendants, as well as the § 3553(a)(6)'s mandate, when metting out its sentence for Sebolt.

6.      Moreover, had Mr. Tyndall objected to the desperate sentence of life imprisonment, Mr. Tyndall could have convinced the Court that a desperate sentence was **not** warranted. As abhorrent as the facts surrounding Sebolt's conviction my be, Sebolt's case pales in comparison to others with similar convictions.

7.      The fact that Sebolt's case is distinct in that the criminal act had occurred while in prison does not warrant a desperate sentence. In fact, it actually **minimized** Sebolt's ability to reach out to a broad audience of thousands such as those whom utilize the Internet

- 23 -

to advertise for the receipt, purchase, sale, distribution, or product-
ion of child pornography.

8.    The failure of both Roberts and Tyndall to move the Court
to consider a sentence that would avoid an unwarranted sentence dispar-
ity among those whom are similarly situated was unreasonable, and thus
their failures amount to a deficient standard of performance.

9.    Sebolt was prejudiced by their omissions because, after
hearing facts of other similarly situated defendants, this Court
may have been inclined to impose a lesser sentence disparity as man-
dated by 18 U.S.C. § 3553(a)(6),

## 2. Challenge to the Life Sentence Imposed as Vehemantly Disproportionate to the Severity of the Offense Such That it Violates the Eighth Amendment.

10.    Sebolt was convicted of making an advertisement (flyer)
seeking to receive and buy child pornography in violation of 18 U.S.C.
§ 2251(d)(1)(A). Trial Tr. pp. 213-214. The flyer was destined to
enter the mail stream, but was stopped short after its discovery by
Bureau of Prisons officials. Trial Tr. pp. 129, 60-63.

11.    At the heart of the offense of conviction was the flyer
addressed to a person in Sri Lanka, that sought photos of minors engaged
in various sexually explicit acts. Trial Tr. pp. 62-63, 98-99; Trial
Exh. 3. The flyer offered graduated payments based upon the acts
depicted and included both drawings and pictures as examples. Id. The
flyer was prepared for mailing to several other individuals in various
foreign countries. Trial Tr. 97-98.

12.    With the life sentence the Court ultimately imposed on
July 9, 2014, (Re-Sentencing Tr. pp. 32-33), and a case within the
jurisdiction of the Fourth Circuit, Sebolt was a prime candidate to
having his sentence reviewed under an Eighth Amendment proportionality

- 24 -

analysis. See <u>United States v. Dowell</u>, 771 F.3d 162, 168 (4th Cir. 2014).

13.    With a legal basis to do so, counsel Mark K. Tyndall failed to challenge, at Sebolt's re-sentencing hearing, that the life sentence imposed upon Sebolt violates the Eighth Amendment prohibition of cruel and unusual punishment. That is, the life sentence, as applied to Sebolt, is grossly disproportionate to his crime.

14.    Tyndall could have plausably argued that the gravity of Sebolt's offense of conviction and the severity of the sentence leads to an inference of gross disproportionality.

15.    Sebolt's offense is not the typical, run-of-the-mill child pornography offense. In fact, the severity of his offense is substant-ially less in comparision to the typical offender whom lurks on the Internet reaching out to hundreds of other child pornographers to trade child pornography in mass quantities, or prays upon children (whether real or fiction) through instant messaging/social media for the purpose of the eventual sexual encounter. And, Sebolt's offense **pales** in comparision to those who produce child pornography or engage in sexually explicit conduct with minors in the course of producing child porno-graphy.

16.    The many factors in mitigation were overshadowed by the fact that this was a crime committed behind prison walls by a recividist offender whom has no respect for the law. However, for the fact that the offense occurred behind prison walls does not make Sebolt more culpable or deserving of a life sentence. In fact, the severity of Sebolt's conduct was limited due to his incarceration, especially when compared to a typical child pornographer unrestricted in the free world.

- 25 -

17.     The fact that Sebolt received zip, zero, zilch professional help/treatment for his mental/sexual conditions throughout his then seven and a half years of incarceration despite his begging for help begs the question as to whether Sebolt could really be considered a recidivist deserving of a life sentence, or even culpable for this committed offense. Did Congress really intend to punish a defendant twice as much (in this case, a life sentence) for an offender that was never given the opportunity to be restored, or at the minimum, the tools necessary to overcome the addiction? Sebolt's opportunity for recovery was stymied by the bureaucratic policies of those that are responsible for his care and well-being. The lack of treatment while in the custody of the Bureau of Prisons played a critical role in Sebolt's culpability to his actions; a fact that this Court has acknowledged. Re-Sentencing Tr. pp. 14-15.

18.     These factors, and more, lead to the inference that a life sentence is grossly disproportionate to the severity of Sebolt's offense of conviction, thus offending the Eighth Amendment's prohibition on cruel and unusual punishment.

19.     Upon a finding by the Court that the gravity of the offense and the severity of the sentence leads to an inference of gross disproportionality, Tyndall would have successfully presented data/evidence of sentences for other offenses in the same jurisdiction and sentences for similar offenses in other jurisdictions that are far less than life sentences when compared to the gravity of Sebolt's offense of conviction. In fact, the offender who repeatedly sexually molests his own

prepubescent daughter, takes numerous photographs of the abuse, and puts them on the Internet for the world to see forevermore, walks away with an 18 year federal sentence. <u>See</u> <u>United States v. Price</u>, 775 F.3d 828, 840 (7th Cir. 2013)(Sentence of 18 years upheld as reasonable).[4]

20.     There can be absolutely no excuse for Tyndall not to raise and argue that the life sentence imposed upon Sebolt at his re-sentencing hearing violates the Eighth Amendment's prohibition on cruel and un-usual punishments. Tyndall's failure is unreasonable such that it amounts to a deficient standard of performance.

21.     Tyndall's failure to raise an Eighth Amendment violation claim prejudiced Sebolt because the opportunity to substantially lower Sebolt's sentence was missed. And, after hearing arguments and a presentation of facts, this Court may have been inclined to lower Sebolt's sentence.

3. <u>The Production-Like Sentencing Scheme in § 2251(e) is Grossly Disproportionate to the Offense Conduct of Solicitation to 'Receive' and 'Buy' Child Pornography--Divisible Elements in § 2251(d)(1)(A)--in Violation of the Eighth Amendment.</u>

22.     The theme of § 2251 is to criminalize and impose sentences for those who engage in sexually explicit conduct for the purpose of producing child pornography. The statute covers various ways in which such offenses may be committed:

   * Subsection (a) criminalizes the production of child
     pornography in the United States;

   * Subsection (b) criminalizes a parent or legal guardian,
     etc., permitting a minor to engage in the production of
     child pornography in the United States;

----
4. Notably, this paticular offender was a repeat sexual predator whom sexually abused his prepubscent sister multiple times over the course of years. Id. at 831-33. He also possessed large amounts of child pornography. Id.

       * Subsection (c) criminalizes the production of child
        pornography outside of the United States for import
        into the United States; and,

       * Subsection (d)(l)(B) criminalizes the solicitation for
        the participation in the act of producing child porno-
        graphy.

    23.    Sebolt was convicted under subsection (d)(l)(A), a subsect-
ion that criminalizes various types of solicitatons of child pornography
to include: receive, exchange, buy, produce, display, distribute, or
reproduce.

    24.    The acts of solicitating to receive and buy child porno-
graphy are synonymous and comport with the actual acts of receiving,
distributing, and trafficking in child pornography; conduct that is
criminalized in 18 U.S.C. § 2252(a)(1)-(3). The nature of those offenses
are much lesser of offenses than the acts of actual production or
solicitation to produce child pornography. In fact, production involves
actual (or prospective) victim(s) engaged in sexually explicit conduct,
child molestation, and exploitation, whereas receiving child porno-
graphy or the solicitations thereof only involve already produced
and circulated child pornography.

    25.    The nature of Sebolt's offense of conviction involved the
acts of solicitation to **receive** and **buy** child pornography. Yet, Sebolt
was subjected to production-like sentences: 15-30 years for first-time
offenders; 25-50 years for second-time offenders; and 35-life for third
time offenders. See § 2251(e). Had Sebolt engaged in offense conduct
of actually receiving child pornography, he would have been subjected
to much less punishments: 5-20 years for first-time offenders and 15-
40 years for second-time offenders. See § 2252(b)(2). Additionally,

- 28 -

Sebolt would have only been subjected to a one-tiered recidivist boost as opposed to two tiers. Thus, Sebolt's statutory max would have been 40 years as opposed to a life sentence; further evincing the distinction between production offenses and receiving/trafficking offenses (to include its respective solicitations) in terms of the nature of the offense, as well as punishment.

26. As such, Sebolt's life sentence, a sentence imposed under a production-like sentencing scheme is grossly disproportionate to Sebolt's offense conduct of solicitation to 'receive' or 'buy' child pornography --divisible elements delineated in § 2251(d)(1)(A).

27. Despite the fact that Sebolt requested re-sentencing counsel Mark K. Tyndall to raise and argue this point at Sebolt's re-sentencing hearing, Tyndall failed to do so. Sebolt Decl. ¶ . His failure is unreasonable such that it amounts to a deficiant standard of performance.

28. Sebolt was prejudiced by Tyndall's omission because the Court imposed an astronomically higher sentence for conduct similar to that of actually receiving child pornography, which imposes at the most a sentence of 40 years, while taking recidivism into account.

G. <u>COUNSEL WAS INEFFECTIVE AT FIRST DIRECT APPEAL BY FAILING TO RAISE AND ARGUE THE ISSUE THAT CERTAIN EVIDENCE ADMITTED UNDER F.R.E. 404(b) WAS WRONGFULLY ADMITTED AS IT WAS NOT AN ACT COMMITTED BY SEBOLT.</u>

<u>Facts</u>

1. Sebolt incorporates herein by reference the facts stated in ground I.B.2. of this motion.

2. Frances H. Pratt, the counsel of record in Sebolt's first direct appeal, in conjunction with trial counsel Valencia D. Roberts,

prepared and filed the opening appeal brief on June 12, 2013 to the Court of Appeals for the Fourth Circuit. See Case No. 13-4093, Dkt. 20.

3.    The sole issue raised on appeal with respect to the conviction was whether the District Court abused its discretion in admitting five pieces of evidence under Federal Rules of Evidence 404(b) where none of them were  relevant, necessary, or reliable, and their probative value was substantially outweighed by unfair prejudice.

4.    Not once, however, was it mentioned or argued in the brief of the fact that the December 2008 letter sent from Roda Tekeste to Sebolt with enclosures was not an act committed by Sebolt and therefore inadmissible under Rule 404(b) of the Federal Rules of Evidence. Nor did they argue that there is not one inkling of evidence to support the conclusion that Sebolt was responsible for such act.

5.    Ms. Pratt's and Ms. Roberts' failure to raise and argue the admissibility of said evidence was completely unreasonable such that it clearly amounts to a deficient standard of performance.

6.    Sebolt was prejudiced in such a way that not only did the admission of such piece of evidence cause unfair prejudice, it only served to emphasize Sebolt's bad character and propensity to commit crimes against children; evidence of which the trier-of-fact wholly relied upon in order to erroneously identify and convict Sebolt. Trial Tr. pp. 213-214.

H. COUNSEL WAS INEFFECTIVE AT SECOND DIRECT APPEAL BY FAILING TO RAISE AND ARGUE THE FOLLOWING MERITORIOUS POINTS: (1) THAT THE DISTRICT COURT ABUSED ITS DISCRETION BY FOCUSING EXTENSIVELY ON ONE 18 U.S.C. § 3553(a) SENTENCING FACTOR AT THE EXPENSE OF A REASONED ANALYSIS OF OTHER PERTINENT FACTORS; (2) THAT THE DISTRICT COURT ABUSED ITS DISCRETION BY VIOLATING ITS OBLIGATION TO AVOID UN-WARRANTED SENTENCE DISPARITIES PURSUANT TO 18 U.S.C. § 3553(a)(6); AND, (3) THAT THE LIFE SENTENCE IMPOSED IS VEHEMANTLY DISPROPORT-IONATE TO THE SEVERITY OF THE OFFENSE IN VIOLATION OF THE EIGHTH AMENDMENT.

## Facts

### 1. The District Court Abused its Discretion by Focusing Extensively on One Sentencing Factor at the Expense of A Reasoned Analysis of Other Pertinent Factors.

1.    James B. Donnelly, the counsel of record on Sebolt's second direct appeal following Sebolt's remand for re-sentencing, prepared and filed the opening brief on October 23, 2014 to the Court of Appeals for the Fourth Circuit. See Case No. 14-4547, Dkt. 18.

2.    Two issues were raised on appeal. The one pertinent to this claim was the second issue: whether the District Court committed substantive error by imposing a life sentence  based on assumed future behavior.

3.    Prior to the issuance of the Fourth Circuit's opinion and judgment, Sebolt contacted Mr. Donnelly by letter to inform him of Sebolt's discovery that the Fourth Circuit has held that a District Court abuses its discretion by imposing a sentence that focuses extensively on one § 3553(a) sentencing factor at the expense of a reasoned analysis of other pertinent sentencing factors. Sebolt Decl. ¶  . In doing so, Sebolt pointed out that he believed such has occurr-ed in his case and requested Mr. Donnelly to consider making such

- 31 -

legal argument in his appeal. Id.

4.      In a letter response, Mr. Donnelly actually agreed with Sebolt's proposed argument, but declined to supplement the brief as he felt that such argument was already adequately addressed in the opening brief. Id.

5.      However, to the contrary, Mr. Donnelly did <u>NOT</u> factor such legal argument into the opening brief. Rather, the argument he made to support the contention that Sebolt's sentence was substantively unreasonable was that the **degree of the variance** (or extent of the deviation) did not comport in relation to its justification. Def.'s Opening Brief at p. 12. In other words, Sebolt's life sentence from an otherwise mandatory minimum guideline sentence of 35 years cannot be supported by an insignificant justification to warrant a non-guideline sentence.

6.      Had Mr. Donnelly adopted and argued Sebolt's proposed issue, the Appellate Court would have been inclined to find an abuse of discretion and remanded the case to impose a new lower sentence.

7.      The District Court justified its upward variance based upon the need to protect the public because of Sebolt's assumed future behavior. Re-Sent. Tr. p. 31. "Specifically, the danger to others." Id. at p. 32. It is also worth noting that the Court in fact acknowledged that 35 years is a just punishment; "an extraordinarily long sentence that everybody gets for the crime for which [Sebolt] was convicted." Id. at pp. 29, 31.

8.      There is absolutely no rational bases as to why--even **after agreeing** with Sebolt--Mr. Donnelly did not raise Sebolt's proposed argument on direct appeal. Mr. Donnelly's omission was unreasonable such that it amounts to a deficient standard of performance at

Sebolt's second direct appeal.

2. <u>The District Court Abused its Discretion by Violating its Obligation to Avoid Unwarranted Sentence Disparities as Mandated by 18 U.S.C. § 3553(a)(6).</u>

9.    James B. Donnelly, Sebolt's counsel of record on his second direct appeal, failed to raise the issue and argue on appeal that the District Court committed both procedural and substantive error by failing to properly consider the sentences of similarly situated defendants as to Sebolt with similar records who have been found guilty of similar conduct.

10.    The District Court in this case only made a conclusory blanket assertion that "everybody gets an extraordinarily long sentence for the crime for which [Sebolt] was convicted." Re-Sent. Tr. p. 31. The Court determined the baseline sentence to be 35 years. Id.

11.    The Court, however, sentenced Sebolt to life. This created a sentence disparity between Sebolt and what the Court considered "everybody else." Id. Moreover, in choosing to impose a life sentence, the Court failed to explain how, or why, such disparity was warranted in this case in relation to "everybody else."

12.    As such, the District Court abused its discretion in failing to consider the sentences of other defendants with similar records who have been found guilty of similar conduct, failing to explain why such disparity was warranted, and failing to flesh out a sentence similar to those of Sebolt's comparator(s).

13.    Mr. Donnelly's failure to raise and argue this on direct appeal was unreasonable such that it amounts to a deficient standard of performance.

### 3. The Life Sentence Imposed is Vehemantly Disproportionate to the Severity of the Offense in Violation of the Eighth Amendment.

14.    Sebolt incorporates  herein by reference  the facts stated in ground I.F.2. of this motion to the extent applicable to this claim.

15.    James B. Donnelly, Sebolt's counsel of record on his second direct appeal, failed to raise and argue the issue as to whether Sebolt's life sentence imposed is disproportionate to the severity of the offense in violation of the Eighth Amendment's prohibition to cruel and unusual punishment despite Sebolt's request for Mr. Donnelly to do so. Sebolt Decl. ¶    .

16.    With a legal basis to do so, Mr. Donnelly could have plausably argued that the gravity of Sebolt's offense of conviction and the severity of the sentence leads to an inference of gross disproportionality.

17.    Upon such a finding, Mr. Donnelly would have successfully presented data/evidence of sentences for other offenses in the same jurisdiction and sentence for similar offenses in other jurisdictions that are far less than life sentences when compared to the gravity of Sebolt's offense of conviction.

18.    There can be absolutely no excuse for Mr. Donnelly not to raise and argue this issue on appeal. Mr. Donnelly's failure is unreasonable such that it amounts to a deficient standard of performance.

19.    Mr. Donnelly's failure to raise and argue an Eighth Amendment violation claim on appeal prejudiced Sebolt because an opportunity to substantially lower Sebolt's sentence was missed; Sebolt may be procedurally barred from bringing forward a stand-alone Eighth Amendment violation in this motion. And, after hearing argu-

ments and a presentation of facts, the Court of Appeals may have been inclined to remand the case back to the District Court for imposition of a lower sentence in compliance with the U.S. Constitution.

(b) **Direct Appeal of Ground One:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

            Yes ☐       No ☒

    (2)  If you did not raise this issue in your direct appeal, explain why: See United States v. Baptiste, 596 F.3d 214, 216 n.1 (4th Cir. 2009)(quoting Massero v. United States, 538 U.S. 500 (2003) and explaining why Ineffective Assistance of Counsel claims are better reserved for a 28 U.S.C. § 2255 motion).

(c) **Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

            Yes ☐       No ☒

    (2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

    (3)  Did you receive a hearing on your motion, petition, or application?

            Yes ☐       No ☐

    (4)  Did you appeal from the denial of your motion, petition, or application?

            Yes ☐       No ☐

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

            Yes ☐       No ☐

    (6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: _____

_____

_____

_____

_____

GROUND TWO:   THE LIFE SENTENCE IMPOSED IS VEHEMANTLY DISPROPORTIONATE TO TO THE SEVERITY OF THE OFFENSE IN VIOLATION OF THE EIGHTH AMENDMENT.

(a)   Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

### Facts

1.     Sebolt was convicted of making an advertisement (flyer) seeking to receive and buy child pornography in violation of 18 U.S.C. § 2251(d)(1)(A). Trial Tr. pp. 213-214. The flyer was destined to enter the mail stream, but was stopped short after its discovery by Bureau of Prisons officials. Trial Tr. pp. 129, 60-63.

2.     At the heart of the offense of conviction was the flyer addressed to a person in Sri Lanka, that sought photos of minors engaged in various sexually explicit acts. Trial Tr. pp. 62-63, 98-99; Trial Exh. 3. The flyer offered graduated payments based upon the acts depicted and included both drawings and pictures as examples. Id. The flyer was prepared for mailing to several other individuals in various foreign countries. Trial Tr. 97-98.

3.     With a life sentence the Court ultimately imposed on July 9, 2014 (Re-Sent. Tr. pp. 32-33; Judgment & Committment Order (Dkt. 69)) and a case within the jurisdiction of the Fourth Circuit, Sebolt is a prime condidiate to having his sentence reviewed under an Eighth Amendment proportionality analysis.

4.     Sebolt's offense is not the typical, run-of-the-mill child pornography offense. In fact, the severity of his offense is substant-

ially less in comparision to the typical offender whom lurks on the
Internet reaching out to hundreds of other child pornographers to trade
child pornography in mass quantities, or prays upon children (whether
real or fiction) through instant messaging/social media for the purpose
of the eventual sexual encounter. And, Sebolt's offense pales in
comparision to those who produce child pornography or engage in sexually
explicit conduct with minors in the course of producing child porno-
graphy.

   5.   The many factors in mitigation were overshadowed by the
fact that this was a crime committed behind prison walls by a recividist
offender whom has no respect for the law. However, for the fact that
the offense occurred behind prison walls does not make Sebolt more
culpable or deserving of a life sentence. In fact, the severity of
Sebolt's conduct was limited due to his incarceration, especially when
compared to a typical child pornographer unrestricted in the free
world.

   6.   The fact that Sebolt received zip, zero, zilch professional
help/treatment for his mental/sexual conditions throughout his then
seven and a half years of incarceration despite his begging for help
begs the question as to whether Sebolt could  really be considered
a recidivist deserving of a life sentence, or even culpable for this
committed offense. Did Congress really intend to punish a defendant
twice as much (in this case, a life sentence) for an offender that
was never given the opportunity to be restored, or at the minimum, the
tools necessary to overcome the addiction? Sebolt's opportunity for
recovery was stymied by the bureaucratic policies of those that are
responsible for his care and well-being. The lack of treatment while in
the custody of the Bureau of Prisons played a critical role in Sebolt's

- 37 -

culpability to his actions; a fact that this Court has acknowledged. Re-Sentencing Tr. pp. 14-15.

7.    These factors, and more, lead to the inference that a life sentence is grossly disproportionate to the severity of Sebolt's offense of conviction, thus offending the Eighth Amendment's prohibition on cruel and unusual punishment.

(b) **Direct Appeal of Ground Two:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☐    No ☒

    (2)  If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(c) **Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐    No ☒

    (2)  If you answer to Question (c)(1) is "Yes," state:

    Type of motion or petition: _____

    Name and location of the court where the motion or petition was filed: _____

_____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

    (3)  Did you receive a hearing on your motion, petition, or application?

        Yes ☐    No ☐

    (4)  Did you appeal from the denial of your motion, petition, or application?

        Yes ☐    No ☐

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐    No ☐

    (6)  If your answer to Question (c)(4) is "Yes," state:

    Name and location of the court where the appeal was filed: _____

_____

    Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this

issue: _____

_____

_____

_____

_____

_____

GROUND THREE:   THE PRODUCTION-LIKE SENTENCING SCHEME IN § 2251(e) IS GROSSLY DISPROPORTIONATE TO THE OFFENSE CONDUCT OF SOLICIATION TO 'RECEIVE' AND 'BUY' CHILD PORNOGRAPHY--DIVISIBLE ELEMENTS DELINEATED IN § 2251(d)(1) (A)--IN VIOLATION OF THE EIGHTH AMENDMENT.

(a)  Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

<u>Facts</u>

1.       The theme of § 2251 is to criminalize and impose sentences for those who engage in sexually explicit conduct for the purpose of producing child pornography. The statute covers various ways in which such offenses may be committed:

* Subsection (a) criminalizes the production of child pornography in the United States;

* Subsection (b) criminalizes a parent or legal guardian, etc., permitting a minor to engage in the production of child pornography in the United States;

* Subsection (c) criminalizes the production of child pornography outside of the United States for import into the United States; and,

- 39 -

* Subsection (d)(1)(B) criminalizes the solicitation for
  the participation in the act of producing  child porno-
  graphy.

2.    Sebolt was convicted under subsection (d)(1)(A), a subsect-
ion that criminalizes various types of solicitatons of child pornography
to include: receive, exchange, buy, produce, display, distribute, or
reproduce.

3.    The acts of solicitating to receive and buy child porno-
graphy are synonymous and comport with the actual acts of receiving,
distributing, and trafficking in child pornography; conduct that is
criminalized in 18 U.S.C. § 2252(a)(1)-(3). The nature of those offenses
are much lesser of offenses than the acts of actual production or
solicitation to produce child pornography. In fact, production involves
actual (or prospective) victim(s) engaged in sexually explicit conduct.
child molestation, and exploitation, whereas receiving child porno-
graphy or the solicitations thereof only involve already produced
and circulated child pornography.

4.    The nature of Sebolt's offense of conviction involved the
acts of solicitation to **receive** and **buy** child pornography. Yet, Sebolt
was subjected to production-like sentences: 15-30 years for first-time
offenders; 25-50 years for second-time offenders; and 35-life for third
time offenders. See § 2251(e). Had Sebolt engaged in offense conduct
of actually receiving child pornography, he would have been subjected
to much less punishments: 5-20 years for first-time offenders and 15-
40 years for second-time offenders. See § 2252(b)(2). Additionally,
Sebolt would have only been subjected to a one-tiered recidivist boost
as opposed to two tiers. Thus, Sebolt's statutory max would have been
40 years as opposed to a life sentence; further evincing the distinct-

- 40 -

ion between production offenses and receiving/trafficking offenses (to include its respective solicitations) in terms of the nature of the offense, as well as punishment.

     5.     As such, Sebolt's life sentence, a sentence imposed under a production-like sentencing scheme is grossly disproportionate to Sebolt's offense conduct of solicitation to 'receive' or 'buy' child pornography --divisible elements delineated in § 2251(d)(1)(A).

(b) **Direct Appeal of Ground Three:**

    (1)  If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☐     No ☒

    (2)  If you did not raise this issue in your direct appeal, explain why:

_____

_____

(c) **Post-Conviction Proceedings:**

    (1)  Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐     No ☒

    (2)  If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

    (3)  Did you receive a hearing on your motion, petition, or application?

        Yes ☐     No ☐

    (4)  Did you appeal from the denial of your motion, petition, or application?

        Yes ☐     No ☐

    (5)  If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

        Yes ☐     No ☐

    (6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: _____

_____

_____

_____

GROUND FOUR: <u>THE FAILURE OF THE FEDERAL BUREAU OF PRISONS TO PROVIDE MENTAL HEALTH TREATMENT FOR SEBOLT'S SERIOUS AND KNOWN MENTAL ILLNESSES/DEFECTS WHILE IN ITS CUSTODY AND CARE RENDERS SEBOLT'S CONVICTION AND SENTENCE UNCONSTITUTIONAL UNDER THE FIFTH AND EIGHTH AMENDMENTS AND IN VIOLATION OF 18 U.S.C. § 4042(a)(2).</u>

(a)   Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

<u>Facts</u>

1.      Sebolt has been in the custody and care of the Federal Bureau of Prisons (FBOP) since July 1, 2002, both as a Pre-trial detainee (2002 - 2004) and as a sentenced inmate (2004 - Present)[5] stemming from the arrest and 2004 conviction of various child pornography offenses. <u>See United States v. Sebolt</u>, No. 1:02-cr-648-1 (N.D. IL), Judgment and Committment Order (Dkt. 97). He received a 360 Month (30 Yr) sentence in that case. Id. at p. 2.

2.      Sebolt has, on numerous times, requested for the FBOP to provide him with mental health treatment for his documented mental illness: pedophilia.[6] Sebolt Decl. ¶¶   -   . His requests have

5. Sebolt was detained at a county jail in DuPage County pending state charges Illinois between 2004 - 2006.

6. Pedophilia is an illliness recognized in the Diagnostic Statistic Manual, 5th Revision.

either gone ignored, were blown off, or deferred until the last 36
to 60 months from his projected release date (Aug. 2028).

3.    The inaction of the FBOP to provide Sebolt with such
treatment at the very beginning of his 30 year term caused him to
languish in his wrongful thoughts and behaviors for years which finally
culminated into a criminal act several years later.

4.    The FBOP had a duty under 18 U.S.C. § 4042(a)(2) to care
for its inmates including Sebolt. This includes mental health care.
The inaction of the FBOP is a complete disregard of this congressional
directive and a blantent disregard to the Court's recommendation to
provide sex offender treatment. See 1:02-cr-648-1 (N.D. IL), Judgment
and Commitment Order at p. 2. (It is recommended "[t]hat the defend-
ant participate in a sexual treatment program while serving his period
of incarceration in the Bureau of Prisons.").

5.    To date, Sebolt has had absolutely no mental health care
regarding his mental conditions. Sebolt Decl. ¶   . As Judge Ronald
A. Guzman has opined, "...there is no doubt in my mind that the
defendant poses a significant risk of repeating this conduct because
he is not likely to find anywhere any effective rehabilitation."
Judge Guzman blamed this, in part, on the fact that "the failure of
our institutions to deal with this problem in any significant way...
help to make this a much more dangerous world for our children."
Case No. 1:02-cr-648-1 (N.D. IL), Sent. T. (Dkt. 104) at p. 86.

6.    As such, because Sebolt was, and continues to remain, in
the care of the FBOP whom failed to treat Sebolt's mental conditions
despite his own recognition that he suffers from an illness and his
multitude of in vain attempts to get professional help, renders this
conviction and sentence unconstitutional.

- 43 -

(b) **Direct Appeal of Ground Four:**

    (1)   If you appealed from the judgment of conviction, did you raise this issue?

          Yes ☐    No ☒

    (2)   If you did not raise this issue in your direct appeal, explain why:

_____

(c) **Post-Conviction Proceedings:**

    (1)   Did you raise this issue in any post-conviction motion, petition, or application?

          Yes ☐    No ☒

    (2)   If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

    (3)   Did you receive a hearing on your motion, petition, or application?

          Yes ☐    No ☐

    (4)   Did you appeal from the denial of your motion, petition, or application?

          Yes ☐    No ☐

    (5)   If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

          Yes ☐    No ☐

    (6)   If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

    (7)   If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this

issue: _____

_____

_____

_____

_____

13. Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

_____

_____

_____

_____

_____

_____

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the judgment you are challenging?        Yes ☐        No ☒

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.   _____

_____

_____

_____

_____

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At the preliminary hearing:  N/A _____

(b) At the arraignment and plea:  Valencia D. Roberts, Office of the Federal Defend-
er, 701 E. Broad St., Suite 3600, Richmond, VA 23219

(c) At the trial:  Same as #15(b). _____

(d) At sentencing: Same as #15(b) (Jan. 28, 2013); Mark K. Tyndall, PLC, 530
E. Main St., Suite 608, Richmond, VA 23219 (Resentencing - July 9, 2014).

(e) On appeal:  Frances H. Pratt, Office of the Federal Defender, 1650 King

St., Suite 500, Alexandria, VA 22314; and, Valencia D. Roberts, Office of the Federal Defender, 701 E. Broad St., Suite 3600, Richmond VA 23219. (13-4093); James B. Donnelly, P.C., Lynnwood Plaza, 621 Lynnhaven Parkway, Virginia Beach, VA 23452. (14-4547).

(f) In any post-conviction proceeding: N/A

(g) On appeal from any ruling against you in a post-conviction proceeding: N/A

16. Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court and at the same time?        Yes ☐        No ☒

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?        Yes ☐        No ☒

(a) If so, give name and location of court imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?        Yes ☐        No ☐

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

N/A

19. I declare under the penalty of perjury (28 U.S.C. §1746) that the foregoing is true and correct.


Executed (signed) on _October 5, 2016_ (date).


\* \* \*

WHEREFORE, movant prays that the Court grant him all relief to which he may be entitled to in this proceeding. In the alternative, movant respectfully requests an evidentiary hearing so that he may further prove his claims and expand the record.

Respectfully submitted this _5th_ day of _October_, 2016.


_Philip Sebolt_
Philip Sebolt, Movant
Reg. No. 14682-424
F.C.I. Terre Haute
P.O. Box 33
Terre Haute, IN 47808
Appearing Pro Se

## CERTIFICATE OF MAILING

I hereby certify under the penalty of perjury (28 U.S.C. §1746) that on _October 5_, 2016 I have placed the foregoing into the institution's general correspondence outgoing mailbox located at F.C.I. Terre Haute, postage prepaid and affixed to the envelope, for mailing to the Court of Appeals for the Fourth Circuit. See Houston v. Lack, 487 U.S. 266, 273-76 (1988). Note: A legal mail system is unavailable for inmates housed in a Communications Management Unit. See 28 C.F.R. §540.203(b).


_Philip Sebolt_
Philip Sebolt, Movant

- 47 -